Monica RUIZ, Appellant,

v.

TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, Appellees.

No. 01–05–00556–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Nov. 2, 2006.

Rehearing Overruled Feb. 6, 2007.

Brian J. Fischer, Houston, for Appellant.

Francisca Aguirre–Saldana, Asst. County Atty., and Sandra D. Hachem, Senior Asst. County Atty., Houston, for Appellee.

Panel consists of Justices JENNINGS, HANKS, and HIGLEY.

## OPINION ON REHEARING

TERRY JENNINGS, Justice.

We grant appellee's motion for rehearing, withdraw our opinion dated August 3, 2006, and substitute this opinion in its place.

In this accelerated appeal,[1] appellant, Monica Ruiz, challenges the trial court's decree, entered after a bench trial, terminating her parental rights to her minor child, A.J. In two issues, Ruiz contends that the evidence is legally and factually insufficient to support the trial court's findings that she knowingly placed or knowingly allowed A.J. to remain in conditions or surroundings which endangered the physical or emotional well-being of A.J.,[2] that she engaged in conduct or knowingly placed A.J. with persons who engaged in conduct which endangered the physical or emotional well-being of A.J.,[3] and that termination of the parent-child relationship between Ruiz and A.J. was in A.J.'s best interest.[4]

We reverse the portion of the decree terminating the parent-child relationship between Ruiz and A.J.

### Factual and Procedural Background

On September 9, 2003, the Texas Department of Family and Protective Services ("DFPS") filed its petition to terminate Ruiz's parental rights to her son, A.J.

During the trial, DFPS case worker Tammy Brown testified that in June 2003, an individual made a referral to DFPS "stating that [A.J.] was being left with his paternal great grandmother for periods of time where [Ruiz's] whereabouts were unknown." Brown also stated that "it was alleged [that] there were cigarette burns on [A.J.'s] arm and that [Ruiz] could not give a consistent explanation for those said cigarette burns." DFPS then removed A.J. "after a period of time because Ruiz took [A.J.] from the care of the grandmother and they didn't know where [A.J.] was and then, about two months later, [A.J.] was removed and was returned."

Brown further testified that after DFPS removed A.J., it gave Ruiz a family service plan, which stated that DFPS became involved because "it was reported that there were allegations of physical abuse." As part of this plan, DFPS instructed Ruiz to attend individual counseling sessions, family counseling sessions with her boyfriend, anger management classes, parenting classes, and a psychiatric follow-up. DFPS also instructed Ruiz to participate in a drug assessment and random urinalysis exams. Although Ruiz had attended some individual counseling sessions and some anger management classes, Ruiz would have to begin the eight-week session of anger-management classes again because she had missed so many of them. Brown stated that Ruiz went to the Mental Health and Mental Retardation Authority ("MHMRA") one week before trial, but that "they did not see [Ruiz] and there was no time for [Brown] to follow-up for why [MHMRA] wouldn't follow through with services on [Ruiz], to find out what the reasoning was on that." Brown agreed

---

1. *See* TEX. FAM.CODE ANN. § 263.405(a) (Vernon Supp.2005).

2. *See* TEX. FAM.CODE ANN. § 161.001(1)(D) (Vernon Supp.2005).

3. *See* TEX. FAM.CODE ANN. § 161.001(1)(E) (Vernon Supp.2005).

4. *See* TEX. FAM.CODE ANN. § 161.001(2) (Vernon Supp.2005).

that Ruiz had completed the parenting classes required in the plan and that Ruiz also completed a required narcotics assessment "and had a recommendation of psychological on it," but that "there wasn't time to follow through with that recommendation."[5] Brown also noted that Ruiz did attend some family counseling sessions.

Brown also testified that DFPS requested that Ruiz complete "some" of these services shortly after it removed A.J. in September 2003. DFPS also requested that Ruiz complete these services in July 2004, and, in July 2004, DFPS granted Ruiz's request for more time to complete these services. Brown stated that she was not sure whether Ruiz "would ever follow through to complete the services at this point," that DFPS had "given her every opportunity to complete services," that DFPS had "put[ ] family based services in place to where they were going to [Ruiz's] home," and that these services "were not followed through with."

After DFPS removed A.J. in September 2003, he was placed with his paternal great grandmother, "Miss Hernandez."[6] A review of the record reveals that at some point in December 2003, the trial court placed A.J. with Marcella Chappa, Ruiz's cousin, with whom Ruiz was living at the time. The record does not disclose why A.J.'s placement was modified, and DFPS contends that it never agreed with this placement. One of the stipulations for this placement was that Ruiz could not be left unsupervised with A.J. However, when Brown visited the Chappa home in January 2004, she found Ruiz alone with A.J., who was in a "very soaked" diaper "as though he had not been changed since the previous day." Brown also noted that A.J. had "some bruising on his face and a gash on one of his eyes that was fairly deep … and looked like it should have some medical attention." Ruiz told Brown that A.J. had fallen down and that, in Ruiz's opinion, the gash "didn't look like it was that serious." Although Brown removed A.J. from the Chappa home and took him to a clinic to be assessed, there are no medical records or any testimony in the record concerning the results of this medical assessment or whether, in fact, A.J. needed medical attention. A.J. was then returned to the Hernandez home until trial, which was held in November 2004.

Brown asked the trial court to terminate Ruiz's parental rights and asserted that termination would be in A.J.'s best interest for the following reasons:

> Ruiz doesn't have a stable place to live at this point. She is not employed. She has a possibility of some domestic violence going on in her home situation with her current boyfriend. She has not completed her services as we agreed in mediation. She's just proven to have a very unstable life style.[7]

Brown further asserted that A.J. was "an adoptable child," that he "is extremely bonded with the paternal side of his family, especially his great grandmother [Miss Hernandez]," and that there is a very

---

5. Brown's testimony concerning Ruiz's alleged noncompliance with the family service plan lacks significant details. For example, the testimony concerning Ruiz's requirement to seek and receive psychiatric and psychological treatment lacks clarity, and it is difficult for this Court to determine, based on the record before us, whether Ruiz fully complied, or to what level Ruiz did not comply, with these specific provisions of the plan.

6. Hernandez did not testify at trial.

7. Brown testified that A.J.'s father had been ordered to pay child support, to attend individual counseling and parenting classes, and to provide A.J.'s medical insurance, and that he did not comply with any of these orders. His parental rights were also terminated, but he is not a party to this appeal.

large extended family that visits him frequently at Hernandez's home. Brown also stated that she had previously spoken with Ruiz and A.J.'s father concerning termination of their parental rights and that both Ruiz and A.J.'s father had mentioned Chris Levin, a cousin, as a person who would be "a good choice" for A.J.

Brown testified that she had confronted Ruiz about the possibility of domestic violence with her current boyfriend, Ismael Castone, with whom Ruiz was currently living, that Ruiz initially denied that there was domestic violence, but that Ruiz eventually admitted that there had been "some domestic violence" in the relationship. Brown stated that Miss Hernandez and Hernandez's daughter had also told her that there was domestic violence in Ruiz's current relationship. Specifically, Hernandez told Brown that on one occasion Ruiz had been brought to her home by Houston Police Officers and that Ruiz had bruising on her face. Ruiz allegedly told Hernandez that Ruiz and Castone had been fighting, Castone had dropped her off on the freeway, and police officers had picked her up and brought her to the Hernandez home.

On cross-examination, Brown stated that the "major issue" with Ruiz was "her instability, as far as not having a place to live" and Ruiz's "just dropping in and out of the services." Brown stated that she had not given consideration to the fact that Ruiz had recently re-engaged in the services prescribed in the plan because, in her opinion, it was "just too late." Brown stated that Ruiz had suggested Marecella Soliz, Castone's mother, as a possible placement for A.J., but that DFPS had not done a home study on Soliz. Brown stated that she had concerns about Ruiz's current living arrangements with regard to domestic violence, but Brown conceded that, to her knowledge, no criminal charges had been filed against Castone.

Ruiz testified that A.J. was born in November 2001, while she was in a home pregnancy placement. Sometime around January 2002, Ruiz moved in with Hernandez, and Ruiz remained at Hernandez's home until approximately March 2003, when Ruiz moved in with a roommate. Ruiz agreed that since moving out of Hernandez's home in March 2003, she had not provided A.J. with a stable home. Ruiz subsequently "found out [her] roommate wasn't the person to have around [her] son," and she placed A.J. in Hernandez's care in the beginning of April 2003 because she did not know anyone else and she "felt like [he would] be better with [Hernandez] for the time." Ruiz had an agreement with Hernandez to leave A.J. with Hernandez until she "got a better place for [them] to live" and that, prior to leaving A.J. at Hernandez's home, she had never left A.J. with anyone else. When she placed A.J. with Hernandez, Ruiz "was trying to make [her]self better," she "wasn't frequently leaving," she "would go and visit [A.J.] the days [she] was off from work and school," and she "would take him [to] where [she] was staying at to spend some time with him." During this time, Ruiz visited A.J. "a few times during the week."

In regard to the alleged cigarette burns, Ruiz stated that when she picked A.J. up from Hernandez, Hernandez told her that the marks were insect bites that had become infected. Ruiz returned A.J. to Hernandez "probably like that week or after or less," and "a few days later" got a call stating that A.J. was "removed out of [her] custody." In regard to the referral made to DFPS, Ruiz stated that at first she "didn't want to go along with the services" and that she "kind of blew it off," but she then decided to participate in the services. In regard to the family services plan, Ruiz admitted that "in the beginning" she was "stubborn" but that a few days later she tried to make arrangements to complete

the services. Initially, Ruiz moved in with her mother because she thought that she would be a big help, but she was not. She then moved in with Chappa. Ruiz enrolled in school, and Chappa provided her room and board in exchange for Ruiz's taking care of Chappa's four children. Ruiz stated that this made it hard to complete her services. Ruiz moved out of Chappa's home in March 2004, and then became pregnant by her new boyfriend, Castone.

Ruiz also testified that "from the very beginning" of this pregnancy there was a concern about the possibility of a miscarriage "so [she] was placed on bed rest." She was "sick for a very good time" and "wasn't able to do anything." After Ruiz had a miscarriage in July 2004, she "jumped right back into [her] services" and did her best to complete as much of the plan as possible. She conceded that from March to May 2004 she did not keep in touch with her case worker and did not inform her that she was having medical problems, but Ruiz did stay in contact with Hernandez. Ruiz stated that there was a period of approximately one to one and one-half weeks in which she did not visit A.J. at Hernandez's home, and this was when she was going through her miscarriage. Prior to that, she would visit A.J. three to four times a week, and during the months before trial, she visited A.J. twice a week for the time that she was permitted.

For the eight months preceding trial, Ruiz lived with Castone and was not working or paying rent. Although she had time to complete the services, she did not. Ruiz also stated that DFPS had provided her with some home services. She agreed that A.J.'s paternal relatives loved him, that she had not provided A.J. with a stable home since she had left him at Hernandez's home, and that Hernandez had provided A.J. with his basic needs. Ruiz noted that she would need two more months

to complete the family services plan because her anger management classes would take eight weeks. She explained that she intended to marry Castone, Castone had a job, Castone supported her, and she and Castone lived with his parents. Ruiz asked the court to consider placing A.J. with her prospective in-laws because they could provide a nice home and had a stable marriage.

In regard to Brown's visit to Chappa's home, Ruiz testified that she did not remember whether A.J. had a soiled diaper, but that she had treated the gash on A.J.'s head with neosporin and alcohol and that she thought the gash would be fine. However, Ruiz agreed that A.J.'s removal from Chappa's home was "justified." She denied that she had been battered by Castone, and instead contended that Houston Police Officers had picked her up on one occasion because they thought she was a minor. Ruiz contended that the officers then gave her a ride to Hernandez's home so that she could visit A.J. She stated that she told Brown that she had an accident and had hit herself on a dresser when she was moving. Ruiz maintained that her current home was free of domestic violence.

In regard to the psychiatric requirements of the family services plan, Ruiz stated that when she went to MHMRA, she reported that she was depressed, would benefit from assistance, and "had experience with alcohol and drugs." However, she subsequently received a letter from MHMRA, which stated that she did not qualify for a psychiatric evaluation. Ruiz explained that she believed that she had satisfied DFPS's requirement to follow through with psychological and psychiatric evaluations. Ruiz stated that her individual counseling was ongoing, she had completed her parenting classes, and she learned a lot about discipline, nutrition,

and child care from her classes. She also testified that if she were to take a drug test, she would be "clean."

Ruiz admitted that she had been repeatedly told that she could lose her son if she did not complete the service plan, that she had reported that she was depressed, that she had drunk alcohol "as early" as April 13 and smoked marihuana "as early" as April 14, that she was only nineteen years old, and that she had not completed her classes because of inconsistent attendance.

Mike Murray, a family therapist and DFPS's witness, testified that he had seen Ruiz in couples and individual therapy, and he recommended returning A.J. to Ruiz based on his experience with Ruiz, her progression in counseling, and his evaluation of her abilities, parenting skills, attitude, temper, and resources. Murray saw Ruiz 15 or 16 times out of 23 scheduled visits. His recommendation was based on Ruiz's commitment that she would continue to see him and his agreement with her that finances would not be a consideration. Murray said that third parties had alleged the existence of domestic violence in Ruiz's relationship with Castone, but that based on his sessions with Ruiz, it was his opinion that there was no concern or issue of violence or abuse.

Patricia Jiminez, A.J.'s great aunt, testified that police officers had previously arrived at her home with Ruiz, Ruiz had told her that Ruiz and Castone had gotten into an argument, Ruiz had a mark on her face, and the police officers had found Ruiz on the roadway. Jiminez stated that Ruiz called Castone, and Ruiz had told Jiminez that she was not going back to Castone.

Lucious Walter, the appointed child advocate, testified that it was in A.J.'s best interest to terminate Ruiz's parental rights. Walter recommended that A.J. be placed with his paternal uncle, Chris Levin.

Following the bench trial, the trial court signed a decree, terminating Ruiz's parental rights to A.J. on the following grounds:

"7.1 The Court finds by clear and convincing evidence that termination of the parent-child relationship between [Ruiz] and the child, [A.J.], the subject of this suit is in the child's best interest.

7.2 Further, the Court finds by clear and convincing evidence that [Ruiz] has:

7.2.1. knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child, pursuant to § 161.001(1)(D) of the Texas Family Code;[8]

7.2.2. engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," pursuant to § 161.001(1)(E) of the Texas Family Code;[9]

### Standard of Review

■■■ A parent's right to "the companionship, care, custody, and management" of her children is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982). The United States Supreme Court has emphasized that "the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000). Likewise, the Texas

---

8. TEX. FAM.CODE ANN. § 161.001(1)(D).

9. TEX. FAM.CODE ANN. § 161.001(1)(E).

Supreme Court has also concluded that "this natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex.1985). Consequently, termination proceedings must be strictly scrutinized, and "involuntary termination statutes are strictly construed in favor of the parent." *Id.*

■ Because termination "is complete, final, irrevocable, and divests for all time that natural right ... the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Id.* (citing *Santosky*, 455 U.S. at 747, 102 S.Ct. at 1391; *Richardson v. Green*, 677 S.W.2d 497, 500 (Tex.1984)). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (Vernon 2002); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex.2002). Because termination findings must be based upon clear and convincing evidence, not simply a preponderance of the evidence, the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–66. Instead, in conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which the State bore the burden of proof. *See id.* at 266. In viewing the evidence in the light most favorable to the judgement, we "must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so," and we "should disregard all evidence that a reasonable fact finder could have disbelieved or found to be incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex.2005) (citing *In re J.F.C.*, 96 S.W.3d 256). In conducting a factual sufficiency review in a termination-of-parental-rights case, we must determine whether, considering the entire record, including both evidence supporting and evidence contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which the State bore burden of proof. *Id.*; *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* at 266.

### Grounds for Termination

■ In proceedings to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated under subsection (1) of section 161.001 and that termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001 (Vernon Supp. 2005). Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.1987). Here, the trial court, in ordering the termination of Ruiz's parental rights as to A.J., expressly found that Ruiz "knowingly placed or knowingly allowed [A.J.] to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of [A.J.]," that Ruiz "engaged in conduct or knowingly placed

[A.J.] with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of [A.J.]," and that "termination of the parent-child relationship between [Ruiz] and the child, [A.J.], ... [was] in [A.J.'s] best interest." TEX. FAM.CODE ANN. § 161.001(1)(D)—(E), (2) (Vernon Supp.2005).

DFPS contends, however, that in terminating Ruiz's parental rights, the trial court could have made a number of other implied findings, including an implied finding that "Ruiz failed to comply with the provisions of a court order that specifically established the actions necessary for [Ruiz] to obtain the return" of A.J. *See* TEX. FAM.CODE ANN. § 161.001(1)(O) (Vernon Supp.2005). DFPS argues that because the trial court's termination of Ruiz's parental rights as to A.J. can be supported by evidence establishing, under section 161.001(1)(O), that Ruiz failed to comply with section 161.001(1)(O) and because Ruiz has not addressed this point in her appeal, she has waived the issue for our review.

In support of its argument, DFPS relies on *Thompson v. Texas Dep't of Family and Protective Servs.*, 176 S.W.3d 121 (Tex.App.-Houston [1st Dist.] 2004, pet. denied). In *Thompson*, we rejected a father's argument that "the trial court's only basis for termination was under Family Code section 161.001(O) because this was the only ground for termination recited in the judgment." *Id.* at 125. Citing Texas Rule of Civil Procedure 299a,[10] DFPS also asserts that findings of fact may not be recited in a judgment. DFPS reasons that because the trial court's findings supporting the termination are recited in the decree, the trial court did not make any formal findings that this Court must treat as the sole basis for the trial court's judgment. *See id.*

Essentially, DFPS is asserting that in every parental termination case, regardless of any express ground relied upon by the trial court in a termination order, a reviewing court may consider the sufficiency of the evidence to support termination of parental rights under any of the nineteen other grounds specified in section 161.001(1) and affirm if the parent fails to challenge on appeal grounds not found in the termination order but supported by the evidence. Specifically, DFPS asks this Court to affirm the trial court's termination of parental rights on the ground that, in violation of section 161.001(1)(O), Ruiz failed to comply with the provisions of a court order that established the actions necessary for her to obtain A.J.'s return, even though the trial court did not make any such express finding in its termination order. However, this Court, in an en banc opinion, has specifically rejected DFPS's argument that we may affirm a trial court's termination order on the basis of a subsection of section 161.001, which, although pleaded by DFPS in its original petition, was not expressly found to have been violated in the decree. *Cervantes-Peterson v. Texas Dep't of Family & Protective Servs.*, No. 01–05–00307–CV, slip op. at 13, 15, — S.W.3d —— (Tex.App.-Houston [1st Dist.] 2006, no pet. h.). We overruled our previous holding in *Thompson* that findings made in a judgment, which are required by statute, cannot form the basis of an appeal. *Id.* As we noted in *Cervantes-Peterson*, DFPS "appears to confuse the general rule in civil cases that findings should not be made in the judgment with the requirement that the findings in section 161.001 of the Texas Family Code be made in a parental-rights-termination order." *Id.* (quoting *Vasquez v. Texas Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 194 (Tex.App.-

10. *See* TEX.R. CIV. P. 299a.

Houston [1st Dist.] 2005, pet. denied)). Under the Family Code, a trial court "shall render an order" terminating a parent-child relationship only "[i]f the court finds by clear and convincing evidence grounds for termination of the parent-child relationship." TEX. FAM.CODE ANN. § 161.206(a) (Vernon Supp.2005). As we held in *Vasquez,* "a parental rights termination order can be upheld only on grounds both pleaded by [DFPS] and found by the trial court." 190 S.W.3d at 194 (stating, "we decline [DFPS's] invitation to uphold the trial court's termination order on a ground different from that stated in the order.").

■ The trial court's "findings" in the termination order in this case, which are expressly required by section 161.206 of the Family Code and which track the language of subsections (D) and (E) of section 161.001(1) of the Family Code, are not "findings of fact" prohibited by Rule 299a. *Cervantes-Peterson,* No. 01–05–00307–CV, slip op. at 13–14, at ——, 2006 WL 2195241. The "findings" simply articulate the trial court's grounds for terminating parental rights. *Id.* Accordingly, we will review the sufficiency of the evidence presented under the specific statutory grounds found by the trial court in its termination order.[11] *See Vasquez,* 190 S.W.3d at 194.

### Sufficiency of the Evidence

In her first issue, Ruiz argues that the evidence is legally and factually insufficient to support the trial court's termination of parental rights as to A.J. because DFPS did not present any evidence that

(1) Ruiz knowingly placed or knowingly allowed A.J. to remain in conditions or surroundings which endangered the physical or emotional well-being of A.J. or (2) Ruiz engaged in conduct or knowingly placed A.J. with persons who engaged in conduct which endangered the physical or emotional well-being of A.J.

■ Under section 161.001(1)(D), a court may terminate the parent-child relationship if the court finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which "endanger" the physical or emotional well-being of the child. TEX. FAM.CODE ANN. § 161.001(1)(D). Under section 161.001(1)(E), a court may terminate the parent-child relationship if the court finds by clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct that "endangers" the physical or emotional well-being of the child. TEX. FAM.CODE ANN. § 161.001(1)(E). "Endanger" means to expose to loss or injury or to jeopardize. *Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987); *In re J.T.G.,* 121 S.W.3d 117, 125 (Tex.App.-Fort Worth 2003, no pet.). The term means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Boyd,* 727 S.W.2d at 533. However, it is not necessary that the conduct be directed at the child or that the child actually suffer injury. *Id.; see also Robinson v. Texas Dep't of Protective and*

---

11. DFPS notes that section 161.206 of the Family Code states that "[i]f the court finds by clear and convincing evidence grounds for termination ... it shall render an order terminating the parent-child relationship." *See* TEX. FAM.CODE ANN. § 161.206(a) (Vernon Supp.2005). DFPS further notes that the Family Code states that " '[r]ender' means the pronouncement by a judge of the court's rul-

ing" and that "[t]he pronouncement may be made orally in the presence of the court reporter or in writing, including on the court's docket sheet or by a separate written instrument." *Id.* § 101.026 (Vernon 2002). In this case, the trial court signed a written decree containing the basis for termination of Ruiz's parental rights.

*Regulatory Servs.*, 89 S.W.3d 679, 686 (Tex.App.-Houston [1st Dist.] 2002, no pet.).

 Under section 161.001(1)(D), "it is necessary to examine evidence related to the environment of the child[ ] to determine if the environment was the source of endangerment to the child's[ ] physical or emotional well-being." *In re J.T.G.*, 121 S.W.3d at 125; *see also In re D.J.J.*, 178 S.W.3d 424, 429 (Tex.App.-Fort Worth 2005, no pet.) ("The phrase 'conditions or surroundings' in section 161.001(1)(D) refers only to the acceptability of the child's living conditions and does not concern the conduct of the parents toward the children"); *In re U.P.*, 105 S.W.3d 222, 236 n. 7 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). In contrast, "[u]nder section 161.001(E), the danger to a child must arise solely by the parent's conduct established by the parent's actions or by the parents failure to act." *Robinson*, 89 S.W.3d at 686. "The relevant inquiry is whether evidence exists that the endangerment of the child's physical [or emotional] well being was the direct result of the parent's conduct, including acts, omissions, or failures to act," and termination under this section "must be based on more than a single act or omission." *In re J.T.G.*, 121 S.W.3d at 125. Rather, "a voluntary, deliberate, and conscious course of conduct by the parent is required." *Id.* The focus of subsection (1)(E), in contrast to subsection (1)(D), is clearly on conduct that actually endangers the well-being of the child.

In support of termination under section 161.001(1)(D) and (E), DFPS cites evidence that a referral was made that A.J. received cigarette burns that Ruiz could not explain and that Ruiz left A.J. with his great grandmother for extended periods of time while Ruiz's whereabouts were unknown. DFPS also asserts that the evidence showed that Ruiz took A.J. for two months after the initial referral, that DFPS could not find Ruiz for a "substantial period of time," and that DFPS was "unable to promptly investigate the burn or remove [A.J.]." DFPS concludes that a reasonable trier of fact could have concluded that Ruiz went to an unknown location after the referral to DFPS so that the burn would heal before an investigation could be conducted. DFPS also asserts that Ruiz "did not directly say that the marks on [A.J.] were not cigarette burns" and that a reasonable trier of fact could have concluded Ruiz was attempting to hide the "actual nature" of A.J.'s injuries. Second, DFPS cites evidence that when A.J. was placed in the Chappa home, Ruiz was found alone with A.J., in violation of a stipulation to the placement, and that A.J. had a "very soaked diaper," bruising, and a gash above of his eye. DFPS asserts that a reasonable trier of fact could have disbelieved Ruiz's explanation for the injuries and could have believed that Ruiz's treatment of the gash was inadequate. Based on this evidence, DFPS argues that there was legally and factually sufficient evidence to support the finding under section 161.001(1)(D) that Ruiz endangered A.J. and knowingly placed or knowingly allowed A.J. to remain in conditions that endangered his well being.

Also, in regard to the trial court's finding under section 161.001(1)(E), DFPS focuses on Ruiz's admission that she used marijuana on April 14, 2003, when her parental rights were in jeopardy and when she may have been pregnant and on bed rest for a high risk pregnancy with another child who was not the subject of the termination proceeding. DFPS asserts that "a mother's use of drugs during a recent pregnancy may be considered endangering a child." DFPS contends that this evidence, considered with the above evidence that Ruiz caused or allowed injuries to A.J. while he was in her care,

supports a finding that Ruiz engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child.

In response to the trial court's findings under subsections (D) & (E), Ruiz cites to the evidence showing that she placed A.J. in Hernandez's care in the beginning of April 2003 until she could find "a better place for [them] to live" and that she had an agreement with Hernandez to leave A.J. with her. She stated that she never left A.J. with anyone else. Ruiz visited A.J. when she was off from work and school, at least a few times during the week. She asserts that there is simply no testimony in the record which indicates that she left her child in conditions or surroundings which endangered his physical or emotional well being.

Ruiz also notes that there was no testimony that the alleged cigarette burns occurred while the child was in Ruiz's care and that she denied that the burns occurred while the child was in her care. She also asserts, in regard to the alleged gash on A.J.'s eye, that "children do sustain injuries in the normal course of their daily activities" and that there was no evidence "to indicate that the cut was sustained in any other manner."

Our review of the evidence reveals that the only direct testimony related to the initial referral was provided by Brown, who stated that "it was alleged [that] there were cigarette burns on [A.J.'s] arm and that [Ruiz] could not give a consistent explanation for those said cigarette burns." Thus, the evidence presented at trial does not indicate who made the referral or if the person who made the referral was alleging that Ruiz was responsible for the alleged burns. Rather, the record only indicates that Ruiz "could not explain" the alleged burns. Furthermore, a reasonable fact finder could only have considered Ruiz's testimony to constitute a denial that she was responsible for the alleged burns. In fact, Ruiz testified that the burns, if any, were incurred while A.J. was in the care of Hernandez or another person. Additionally, the record does not establish, much less support an inference, that after the referral, Ruiz took A.J. from Hernandez's home for a two month period to an unknown location for the purpose of concealing A.J.'s burns from a DFPS investigator and waiting for the burns to heal. Brown only testified that A.J. "was removed after a period of time because Ruiz took [A.J.] from the care of the grandmother," that they didn't know where [A.J.] was, and that, "about two months later, [A.J.] was removed and was returned." Brown's testimony concerning the initial referral and subsequent removal of A.J. simply does not establish, or even support an inference, of what DFPS alleges. Instead, DFPS's evidence only indicates that A.J. was removed two months after the initial referral. Ruiz testified, to the contrary, that around the time of the initial referral, she took A.J. for approximately one week from the Hernandez home. Finally, there is no testimony from Brown or from any other witness establishing that when Ruiz removed A.J. from the Hernandez home, she did so in violation of a court order or family services plan that had already been entered in this case or in violation of her informal agreement with Hernandez regarding A.J.'s living arrangements. Significantly, there is no evidence that at the time DFPS alleges that Ruiz took A.J. from the Hernandez home in an effort to conceal his injuries that Ruiz even had knowledge that a referral had been made to DFPS.

However, there is evidence that Ruiz was found in the Chappa home with A.J. in violation of the terms of A.J's placement with Chappa and that when Brown visited A.J. at Chappa's home he was in a "very

soaked diaper" and had some bruising and a gash above of his eye. Ruiz testified that she treated the gash with neosporin and alcohol and that the gash did not appear to be too serious to either Ruiz or Chappa. DFPS asserts that, based on this evidence, "a reasonable trier of fact could have inferred that, even though Ruiz provided an attempt at her own medical care for [A.J.], [Ruiz] nevertheless allowed [A.J.] to remain in surroundings or circumstances that endangered [A.J.'s] physical well-being and failed to ameliorate the cause of the injuries in the first place."

In support of its argument that, based on this evidence, there was legally and factually sufficient evidence to support a finding that Ruiz endangered A.J. and knowingly placed or knowingly allowed A.J. to remain in conditions that endangered his well being, DFPS cites *In re J.P.B.*, 180 S.W.3d at 574. However, *In re J.P.B.* is easily distinguishable and the facts supporting termination were much more substantial. In that case, (1) the father testified that he and his wife shared in the child's care; (2) a July 7, 2002 x-ray revealed that the child had rib fractures that likely occurred between July 5, 2002 and July 7, 2002; (3) the father testified that he and his wife were home alone with the child on those dates; (4) DFPS's expert testified that twenty-one fractures, which were approximately one to four weeks old, were detected in the child's July 19, 2002 survey; and (5) there was expert testimony that the child's injuries were likely caused by excessive force such as abrupt yanking, pulling, or punching, that a parent should have known that something was wrong with a child, and that a parent should have noticed high-pitched screams from the child due to the fractures. *Id.* at 573. The Texas Supreme Court stated that even though undisputed evidence showed that the father sought medical care for the child multiple times and that the child's doctors initially failed to diagnose the fractures, a reasonable jury could infer, based on evidence that the child "sustained twenty-one fractures during a time when he was under [the father's] care," that the fractures "were likely caused by [ ] abusive treatment," that "the fractures did not occur all at once and were the result of ongoing mistreatment," and that the father "allowed the child to remain in surroundings that endangered his physical well-being" and "knowingly failed to ameliorate the underlying cause" of his injuries. *Id.* at 574.

Unlike the evidence presented in *In re J.P.B*, the evidence in this case showed, or would permit a reasonable inference, that the referral to DFPS was initiated by non-specific allegations that A.J. received a cigarette burn, that Ruiz left A.J. for extended periods of time with his paternal great grandmother while her whereabouts were unknown, and that A.J. was found alone with Ruiz in the Chappa home, in violation of a stipulation, with a soiled diaper, bruising, and a gash above his eye. There was no evidence presented at trial that Ruiz caused or was present when the original injury was sustained. There was also no evidence that the injuries incurred at the Chappa home were caused by abusive treatment. Instead, the only evidence concerning these injuries was presented by Brown, who merely stated that the gash above A.J's eye "looked like it should have some medical attention" above and beyond the basic first aid treatment applied by Ruiz. There was no evidence presented that Ruiz's attempt at treating the gash was ultimately deemed inadequate or that Ruiz endangered A.J.'s physical or emotional well being through her allegedly deficient treatment. Accordingly, we hold that the evidence was legally insufficient for a reasonable fact finder to form a "firm belief or conviction" that Ruiz knowingly placed or knowingly allowed A.J. to remain

in conditions or surroundings that endangered his well-being. We further hold that the trial court erred in terminating Ruiz's parental rights on the ground that she violated section 161.001(1)(D).

■ We next turn to the finding in the termination decree under section 161.001(1)(E). Again, we note that under this section, we must determine whether there is evidence that the endangerment of the child's physical or emotional well being was the direct result of the parent's conduct. *Robinson,* 89 S.W.3d at 686. In addition to the above cited conduct, DFPS notes that Ruiz admitted that she smoked marijuana in mid April 2003, when her rights to A.J. were in jeopardy, and that other evidence suggests that Ruiz could have been pregnant with another child at the time. Ruiz offered contradictory testimony as to whether she may have been pregnant at the time, but we agree that the evidence was sufficient to permit a fact finder to make this inference. We also agree that, in some circumstances, narcotics use may give rise to termination under section 161.001(1)(E). *See Robinson,* 89 S.W.3d at 686–87. However, the evidence in this case concerning Ruiz's alleged narcotics use was extremely limited and does not support a finding, by itself, that Ruiz engaged in conduct or knowingly placed A.J. with persons who engaged in conduct that endangered A.J.'s physical or emotional well being. Furthermore, we note that termination under this section "must be based on more than a single act or omission," and here there is no direct evidence that Ruiz had an ongoing narcotics problem that would support a finding under this section. Ruiz contended at trial that she was "clean," and, other than conceding that she had past "experience with alcohol and drugs," she only specifically

admitted to smoking marijuana on one occasion; there was no evidence presented to contradict her testimony. More importantly, there is no evidence that she used narcotics when she was caring for A.J. or that A.J. was in her presence when she used narcotics. In fact, the testimony indicates that A.J. was likely in the care of Hernandez in April 2003. The evidence of Ruiz's narcotics use, together with the other evidence cited by DFPS, simply does not establish "a voluntary, deliberate, and conscious course of conduct" sufficient to support a termination finding under section 161.001(1)(E). *See In re D.J.J.,* 178 S.W.3d at 430 (stating that there was no evidence that father's use of narcotics that resulted in arrest and imprisonment endangered child's physical or emotional well being). Accordingly, we hold that the evidence was legally insufficient for a reasonable fact finder to form a "firm belief or conviction" that Ruiz engaged in conduct or knowingly placed A.J. with persons who engaged in conduct which endangered the physical or emotional well-being of A.J. We further hold that the trial court erred in terminating Ruiz's parental rights on the grounds that she violated section 161.001(1)(E).

We sustain Ruiz's first issue.[12]

### Conclusion

Having held that the trial court erred in terminating Ruiz's parental rights on the grounds that she violated section 161.001(1)(D) and (E), we need not address Ruiz's second issue in which she contends that the evidence was legally and factually insufficient to support the trial court's findings that termination of the parental relationship was in A.J.'s best interest.

---

12. Having held that the trial court's findings to terminate Ruiz's parental rights under section 161.001(1)(D), (E) were not supported by legally sufficient evidence, we need not address Ruiz's factual sufficiency arguments.

We reverse the portion of the of the decree terminating the parent-child relationship between Ruiz and A.J. and we render judgment that her parental rights to A.J. are not terminated.