Opinion issued February 5, 2009











In The

Court of Appeals

For The

First District of Texas






NO. 01-08-00195-CV






TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES,
Appellant


V.


JERRY SILVA, Appellee






On Appeal from the 300th District Court

Brazoria County, Texas

Trial Court Cause No. 28779






MEMORANDUM OPINION

 Appellant, the Texas Department of Family and Protective Services ("DFPS"), (1)
challenges the trial court's judgment naming appellee, Jerry Silva, as permanent
possessory conservator of his child in DFPS's suit to terminate Silva's parental rights
to the child. (2) In three issues, DFPS contends that the trial court erred in determining
that there is legally insufficient evidence that Silva knowingly placed or knowingly
allowed the child to remain in conditions or surroundings which endangered the
physical or emotional well-being of the child; (3) Silva engaged in conduct, or
knowingly placed the child with persons who engaged in conduct, that endangered
the physical or emotional well-being of the child; (4) Silva failed to comply with
provisions of a court order that specifically established the actions necessary for him
to obtain the return of his child after the child had been removed from him for abuse
or neglect and had been in the care of DFPS for at least nine months; (5) and termination
of the parent-child relationship between Silva and the child was in the child's best
interest. (6)

 We affirm.

Factual and Procedural Background

 On March 29, 2006, DFPS filed its original petition in this suit affecting the
parent-child relationship ("SAPCR") requesting, among other things, a show-cause
hearing and the appointment of DFPS as temporary sole managing conservator of the
child. On April 3, 2006, the trial court held a hearing on DFPS's application for
temporary orders relating to the removal of the child from the possession of the
child's mother, Kyra Allison. After finding that prior to the removal of the child there
had been "sufficient evidence to satisfy a person of ordinary prudence and caution
that there was a continuing danger to the physical health or safety of the child which
was caused by an act or failure to act of the person entitled to possession," (7) the trial
court appointed DFPS the temporary managing conservator of the child and appointed
Allison temporary possessory conservator. The trial court also ordered Allison to
submit to a psychological assessment, attend parenting classes, attend counseling,
complete a drug and alcohol assessment, remain drug- and alcohol-free, maintain a
safe and stable home environment, and comply with DFPS's service plan.

 The only reference to Silva in the trial court's temporary orders states that Silva
"did not appear." As DFPS stated in a later motion, when the hearing "was held on
April 3, 2006, Respondent Father Jerry Silva had not been served, so the court could
not order that he participate in services." 

 The trial court, on November 28, 2006, held a hearing on the required
participation of the child's father, Silva, in DFPS services with the goal of family
reunification, but Silva did not appear at this hearing. Nevertheless, the trial court
ordered that Silva submit to a psychological assessment, attend parenting classes,
attend counseling, complete a drug and alcohol assessment, remain drug- and alcohol-free, maintain a safe and stable home environment, and comply with DFPS's service
plan to "obtain the return of the [child]."

 On May 15, 2007, Silva filed an amended answer and original cross-petition
in the SAPCR, seeking sole managing conservatorship of the child. On August 13,
2007, DFPS filed its second amended petition in the SAPCR, requesting appointment
as sole managing conservator of the child with the goal of either reunifying the child
with Allison and Silva or, in the alternative, termination of Allison's and Silva's
parental rights.

 In the SAPCR trial, Jerome Barber, an investigator for Child Protective
Services ("CPS") in Brazoria County, testified that on March 9, 2006, he contacted
Allison to discuss information CPS had received that Allison was endangering her
child. During the phone call, Allison "admitted to experimenting with heroin,
marijuana, methamphetamines, [and] ecstasy" and to a "past history with alcohol
abuse." Barber also discovered that Allison had a "bipolar disorder issue." Although
CPS did not immediately remove the child from Allison's care, Barber did
temporarily place the child in the care of Elaine Felan, a family friend, while he
investigated any abuse or neglect of the child. 

 On March 22, 2006, Barber spoke with Silva, who told Barber that Allison had
previously abused alcohol, "had a great deal of drug involvement," associated with
drug users and ex-prostitutes, and was currently in a mental health facility. Silva
further indicated that he was involved in the child's life and "would be cooperative
with CPS as much as possible." Silva admitted to Barber that he had used marijuana
in his past. 

 After learning that Allison had been hospitalized due to extensive heroin use,
Barber placed the child in protective custody on March 29, 2006. (8) When Barber
obtained the child from Felan, the child initially showed a great deal of emotion, but
"halfway through the trip he was very quiet and started to laugh and was adjusted to
the situation." Barber explained that this behavior was strange because children
usually "have a hard time with that initial removal from the home."

 On cross-examination, Barber admitted that he did not remember whether he
had asked Silva how recently Silva had used marijuana. Barber also did not
remember whether he had asked Silva if he would have been willing to take a drug
test. 

 Melissa Rieschick, a CPS supervisor, testified that after a hearing in August
2007, which Allison did not attend, Rieschick received a telephone call from Allison,
in which she asked Rieschick what she needed to do to see the child. Rieschick told
Allison to contact her attorney because "the judge had ordered that she not have any
contact with [the child], until she appeared before him in court and requested
visitation and that it was imperative that she speak with [her attorney], if she wished
to visit with [the child]." 

 Rieschick explained that Silva had attended the hearing and had reached an
agreement with DFPS, the goal of which was reunification of the child with Silva. 
Pursuant to the agreement, Silva had gained increased visitation rights and, on
October 12, 2007, Silva obtained a monitored return of the child. 

 Silva testified that on the night of October 19, 2007, while the child was in his
care pursuant to the monitored return, Allison and two of her friends spent the night
at Silva's house. The next morning, when Silva told Allison that he was planning to
have a friend watch the child while Silva went to work, Allison offered to watch the
child. At first Silva did not want to "risk that," but Allison persuaded Silva to leave
the child with her. However, when Silva returned home after work, Allison and the
child were gone. 

 Silva explained that Allison brought the child back to him the next day and told
him that she had been unable to return the child to him because when she had taken
the child on an errand with two friends, they had car trouble. Silva noted that the
child was not harmed in any way and appeared to be happy. On the morning of
October 22, 2007, Silva received a telephone call from Cheryl Gardowski, a CPS
caseworker who had been in contact with Silva, and he told her what had happened. 
Two days later, Gardowski and another CPS caseworker came to Silva's home, asked
him some questions about the child, and looked around his home. 

 On cross-examination, Silva conceded that he had not complied with portions
of a November 2007 court order requiring that he submit to a psychological
assessment, attend parenting classes, attend counseling, and maintain a safe and stable
home environment. 

 Gardowski testified that after talking to Silva and looking around the house,
she called her supervisor and explained what had happened and that the child was
healthy and happy and that the home looked fine. Nevertheless, Gardowski's
supervisor told her to take the child away from Silva because "we cannot take a
chance of [the child] being left alone with [Allison] again." When Gardowski
removed the child, Silva appeared to be extremely upset, "rubbing his head,
screaming, [and] crying." 

 After DFPS rested, Silva presented his motion for directed verdict, arguing that
the evidence is legally insufficient to support termination of his parental rights under
section 161.001(1)(D), (E), and (O). The trial court granted the motion and, after the
jury returned its findings, the trial court entered an order terminating Allison's
parental rights, appointing DFPS sole managing conservator of the child, and
appointing Silva permanent possessory conservator of the child.

Standard of Review

 The United States Supreme Court has long recognized that a parent's right to
"the companionship, care, custody, and management" of his children is a
constitutional interest "far more precious than any property right." Santosky v.
Kramer, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982). The Court has
emphasized that the interest of parents in the care, custody, and control of their
children "is perhaps the oldest of the fundamental liberty interests recognized by this
Court." Troxel v. Granville, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000). 
Likewise, the Texas Supreme Court has recognized that this parental right is
"essential," "a basic civil right of man," and "far more precious than property rights." 
Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985). "A termination decree is complete,
final, irrevocable, and divests for all time that natural right as well as all legal rights,
privileges, duties and powers with respect to each other except for the child's right
to inherit." Id. Consequently, termination proceedings must be strictly scrutinized,
and "involuntary termination statutes are strictly construed in favor of the parent." 
Id. 

 In a termination proceeding, a trial court may grant a directed verdict when the
evidence is legally insufficient to support termination. See Tex. R. Civ. P. 268. In
reviewing the grant or denial of a directed verdict, an appellate court assesses whether
the trial court correctly determined that the evidence was legally insufficient. See
City of Keller v. Wilson, 168 S.W.3d 802, 823 (Tex. 2005) (stating that "the test for
legal sufficiency should be the same for summary judgments, directed verdicts,
judgments notwithstanding the verdict, and appellate no-evidence review"). 

 Because termination "is complete, final, irrevocable, and divests for all time
that natural [parental] right . . . the evidence in support of termination must be clear
and convincing before a court may involuntarily terminate a parent's rights." Holick,
685 S.W.2d at 20 (citing Santosky, 455 U.S. at 747, 102 S. Ct. at 1391; Richardson
v. Green, 677 S.W.2d 497, 500 (Tex. 1984)). We review the legal sufficiency of the
evidence by viewing the evidence in the light most favorable to the nonmovant to
determine whether any rational trier of fact could have found clear and convincing
evidence supporting termination. See City of Keller, 168 S.W.3d at 823, 825. Clear
and convincing evidence is evidence that produces a firm belief or conviction as to
the truth of the allegations sought to be established in the mind of the fact-finder. 
Tex. Fam. Code Ann. § 101.007 (Vernon 2008); In re J.F.C., 96 S.W.3d 256, 264
(Tex. 2002). In our review, we must credit evidence favorable towards termination
if reasonable jurors could, and disregard evidence contrary to termination unless
reasonable jurors could not. See City of Keller, 168 S.W.3d at 827. 

Endangerment of the Child

 In its first issue, DFPS argues that the trial court erred in granting Silva a
directed verdict as to termination of his parental rights under section 161.001(1)(D)
and (E) of the Texas Family Code because, "considering the evidence in the light
most favorable to DFPS, the court of appeals must conclude that the . . . evidence
raised triable issues of fact for the jury's determination concerning Silva's knowledge
of the mother's dangerous home environment, her severe substance abuse issue, and
the fact that he did nothing to protect [the child] from these conditions."

 Under section 161.001(1)(D), parental rights may be terminated when clear and
convincing evidence shows that a parent has knowingly placed or knowingly allowed
his child to remain in conditions or surroundings that "endanger" the physical or
emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(1)(D) (Vernon
2008). Under section 161.001(1)(E), parental rights may be terminated when clear
and convincing evidence shows that a parent has engaged in conduct or knowingly
placed his child with persons who engaged in conduct that "endangers" the child's
physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(1)(E) (Vernon
2008). "Endanger" means to expose to loss or injury or to jeopardize. Tex. Dep't of
Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987); Ruiz v. Tex. Dep't of
Family & Protective Servs., 212 S.W.3d 804, 814 (Tex. App.--Houston [1st Dist.]
2006, no pet.). The term means "more than a threat of metaphysical injury or the
possible ill effects of a less-than-ideal family environment." Boyd, 727 S.W.2d at
533. However, it is not necessary that the conduct be directed at the child or that the
child actually suffer injury. Id.; see also Robinson v. Tex. Dep't of Protective and
Regulatory Servs., 89 S.W.3d 679, 686 (Tex. App.--Houston [1st Dist.] 2002, no
pet.). 

 Under section 161.001(1)(D), it is necessary to examine evidence related to the
environment of the child to determine if the environment was the source of
endangerment to the child's physical or emotional well-being. Ruiz, 212 S.W.3d at 
815; see In re D.J.J., 178 S.W.3d 424, 429 (Tex. App.--Fort Worth 2005, no pet.)
("The phrase 'conditions or surroundings' in section 161.001(1)(D) refers only to the
acceptability of the child's living conditions and does not concern the conduct of the
parents toward the children."); In re U.P., 105 S.W.3d 222, 236 n.7 (Tex.
App.--Houston [14th Dist.] 2003, pet. denied) (per curiam) (reasoning that unlike
subsection (E), under subsection (D) source of endangerment must be child's
environment). For example, termination under subsection (D) may be supported by
"evidence of extraordinarily unsanitary living conditions." In re J.R., 171 S.W.3d
558, 575 (Tex. App.--Houston [14th Dist.] 2005, no pet.); see also In re M.C., 917
S.W.2d 268, 270 (Tex. 1996) (finding evidence legally sufficient to support
termination based on endangerment of environment when home was infested with
cockroaches; children ate food out of garbage; floor and furniture were littered with
food, dirty clothes, garbage, and feces; children wore soiled diapers and clothes;
children had dried food, feces, and mucus on their skin and clothes; and one child was
found with "dead cockroaches matted in her hair").

 Under section 161.001(1)(E), the danger to a child must arise solely from the
parent's acts or failures to act. Robinson, 89 S.W.3d at 686. The relevant inquiry is
whether evidence exists that the endangerment of the child's physical or emotional
well-being "was the direct result of the parent's conduct, including acts, omissions,
or failures to act." Ruiz, 212 S.W.3d at 815. Termination under 161.001(1)(E) "must
be based on more than a single act or omission." Ruiz, 212 S.W.3d at 815. Rather,
a voluntary, deliberate, and conscious course of conduct by the parent is required. Id. 
The focus of section 161.001(1)(E), in contrast to section 161.001(1)(D), is clearly
on conduct that actually endangers the well-being of the child. Id.

 In support of termination under section 161.001(1)(D), DFPS asserts that Silva
knew that the child's living environment with Allison was "dangerous." Although
Silva acknowledged that Allison had previously abused alcohol and narcotics, there
is no evidence in the record that Silva had knowingly allowed the child to remain in
conditions or surroundings that actually endangered the child. In fact, Silva testified
that during the time that the child lived with Allison, the child always appeared
healthy and happy. Additionally, Barber testified that when he investigated the home
environment of the child in March 2006, nothing in the environment appeared to be
unsafe or inappropriate, and the child "seemed to be fine." In sum, there is no
evidence that Silva placed the child or allowed the child to remain in an environment
that endangered the child.

 In support of termination under section 161.001(1)(E), DFPS relies on evidence
that Silva had allowed the child to remain in Allison's care through March 2006 and
had allowed Allison to watch the child on October 20, 2007 in spite of Silva's
knowledge that Allison's conduct endangered the child. Specifically, DFPS asserts
that Silva knew about Allison's "extensive psychiatric history, association with
known felons, that she was not a stable person for [the child], and that she could not
be trusted and was not a safe caregiver given the party-like and drug-fueled lifestyle
she provided for herself and [the child]." DFPS further asserts that the
"uncontradicted evidence also demonstrates that Silva knew that [Allison] was
drinking alcohol heavily, smoking marijuana, and was involved with drug users and
prostitutes at the time she had custody of [the child]." 

 However, reviewing the evidence in the light most favorable to DFPS, there is
no evidence that Silva was aware of Allison's psychological problems until March
2006, when he became aware that she had entered a mental health facility. Although
there is some evidence that Allison had previously associated with individuals who
had criminal records, there is no evidence that any of these individuals had any type
of contact with the child that endangered the child's physical or emotional well-being. 
There is some evidence that, as early as 2003, Silva knew Allison was smoking
marijuana, and, in 2004, Silva had notified DFPS of Allison's narcotics use. (9) In
March 2006, Silva was aware of increased narcotics and alcohol abuse. When Barber
asked Silva about Allison, Silva told him that Allison was involved with "a great deal
of drugs including marijuana and other pills" and that Allison was "drinking a great
deal."

 Narcotics use, in some circumstances, "may give rise to termination under
section 161.001(1)(E)." See Toliver v. Tex. Dep't of Family & Protective Servs., 217
S.W.3d 85, 98 (Tex. App.--Houston [1st Dist.] 2006, no pet.). However, the
evidence must show that the narcotics use somehow endangers the child. See Toliver,
217 S.W.3d at 100 (finding evidence legally sufficient to support termination when
parent, who was her children's primary caregiver, used narcotics in presence of her
children and did not properly supervise her children, one of whom had specialized
medical needs). Here, however, Silva's uncontradicted testimony indicated that
Allison did not use narcotics while pregnant with or caring for the child. Cf. In re
J.W., 152 S.W.3d 200, 206 (Tex. App.--Dallas 2004, pet. denied), cert. denied, 546
U.S. 1061, 126 S. Ct. 798 (holding that father endangered child by providing cocaine
to mother while they were trying to conceive); In re J.T.G., 121 S.W.3d 117, 125
(Tex. App.--Fort Worth 2003, no pet.) (stating that use of narcotics during pregnancy
may be considered endangering conduct). Additionally, there is no evidence that
Allison had ever used narcotics in the presence of Silva or the child. In sum, there
is no evidence that Allison's use of narcotics or alcohol jeopardized the physical or
emotional well-being of the child. See Boyd, 727 S.W.2d at 531.

 Accordingly, we hold that the trial court did not err in granting Silva a directed
verdict as to termination of his parental rights under sections 161.001(1)(D) and (E)
of the Texas Family Code.

 We overrule DFPS's first issue.

 Failure to Comply with Court Order

 In its second issue, DFPS argues that the trial court erred in granting Silva a
directed verdict as to termination of his parental rights under section 161.001(1)(O)
of the Texas Family Code because the child "was in DFPS custody for at least nine
months," "Silva failed to comply with all the requirements of his service plan," and
"there is sufficient evidence to support a finding that [the child] was removed from
Silva's custody due to his neglect."

 Under section 161.001(1)(O), parental rights may be terminated when clear and
convincing evidence shows that a parent 

 failed to comply with provisions of a court order that specifically
established the actions necessary for the parent to obtain the return of
the child who has been in the permanent or temporary managing
conservatorship of the Department of Family and Protective Services for
not less than nine months as a result of the child's removal from the
parent under Chapter 262 for the abuse or neglect of the child.

Tex. Fam. Code Ann. § 161.001(1)(O) (emphasis added). Chapter 262 is titled
"Procedures in Suit by Governmental Entity to Protect Health and Safety of Child," 
and subchapter B provides the procedures that DFPS may employ in order to remove
a child for abuse or neglect. Id. §§ 262.001-.309 (Vernon 2002 & Supp. 2008).

 Silva does not dispute that the child was in DFPS custody for at least nine
months or that he did not comply with all the requirements of a court-ordered family
service plan. Instead, Silva notes that DFPS did not prove that the child had been
removed from him as a result of his abuse or neglect. Silva relies on this Court's
holding in In re A.A.A., in which we reasoned that in order to support termination of
parental rights under section 161.001(1)(O) of the Texas Family Code, DFPS must
prove by clear and convincing evidence that it has removed a child from a parent for
abuse or neglect. 265 S.W.3d 507, 515 (Tex. App.--Houston [1st Dist.] 2008, pet.
denied); see also In re S.A.P., 169 S.W.3d 685, 705-06 (Tex. App.--Waco 2005, no
pet.) (stating that termination under section 161.001(1)(O) requires some evidence
that parent abused or neglected child). Silva argues that the directed verdict under
section 161.001(1)(O) was proper because "DFPS presented no evidence that the
child was removed from [him] due to abuse or neglect . . . ."

 DFPS agrees that in In re A.A.A. we "held that a showing that a child was
removed from a parent for his or her abuse or neglect is required to terminate parental
rights . . . under Family Code section 161.001(1)(O)." See 265 S.W.3d at 515. 
However, DFPS contends that here, as in In re A.A.A., there is evidence of Silva's
neglect. DFPS asserts that it proved Silva's neglect by presenting evidence that the
child was removed in March 2006. Specifically, DFPS refers to the trial court's
temporary orders of April 3, 2006, in which the trial court found that "there was a
continuing danger to the physical health and safety of the child, which was caused by
an act or failure to act of the person entitled to possession and for the child to remain
in the home is contrary to the welfare of the child." In its brief, DFPS indicates that
this finding applied to Silva. 

 However, the trial court's April 3, 2006 temporary orders, upon which DFPS
relies, expressly applied only to Allison. The trial court specifically found that
Allison had caused a "danger to the physical health or safety of the child," and it was
this danger to the child which allowed DFPS to remove the child from Allison
pursuant to section 262.104(a) of the Texas Family Code. See Tex. Fam. Code Ann.
§ 262.104(a). Based on its findings, the trial court modified Allison's
conservatorship of the child, entered numerous temporary injunctions binding
Allison, and ordered Allison to make child support payments. The trial court only
mentions Silva in these temporary orders to note that he did not appear at the hearing. 
In fact, DFPS acknowledged, in a later motion, that the trial court's April 3, 2006
order did not compel Silva to participate in services because "Silva had not been
served" with notice of the hearing. The trial court later issued two orders, one on
November 28, 2006 and the other on November 13, 2007, requiring Silva's
participation in DFPS's services; however, neither of these two orders indicated that
the child was removed from Silva under Chapter 262.

 Nevertheless, DFPS contends that there is legally sufficient evidence that the
child had been removed from Silva's custody under Chapter 262 due to Silva's
neglect. However, in addition to the fact that no court order indicates that the child
had been removed from Silva under Chapter 262, there is also no evidence that the
child had been removed from Silva based on his neglect. In DFPS's Risk Assessment
Report--entered into evidence as "Silva Exhibit 5"--DFPS recorded that Allison,
Allison's mother, and Mike Felan had neglected the child. DFPS, in the Risk
Assessment Report, did not allege any neglect of the child attributable to Silva. 
Additionally, Cheryl Harvick, Jerome Barber's DFPS supervisor, confirmed that the
reason for the removal of the child from Allison was not due to any neglect of the
child on the part of Silva. In sum, there is no evidence that DFPS had removed the
child from Silva under Chapter 262 based on any alleged neglect of the child by
Silva. (10)

 Accordingly, we hold that the trial court did not err in granting Silva's directed
verdict as to the termination of his parental rights under section 161.001(1)(O) of the
Texas Family Code.

 We overrule DFPS's second issue.

Best Interest

 In its third issue, DFPS asserts that the trial court erred in granting a directed
verdict "based on allegedly legally insufficient 'best interest' grounds under Family
Code section 161.001(2)." In termination proceedings brought under section 161.001
of the Texas Family Code, DFPS must establish, by clear and convincing evidence,
one or more of the acts or omissions enumerated under section 161.001(1) and that
termination is in the best interest of the child under section 161.001(2). Tex. Fam.
Code Ann. § 161.001. Termination may not be based solely on the best interest of
the child. Boyd, 727 S.W.2d at 533 (Tex. 1987); Ruiz, 212 S.W.3d at 812. Here, the
trial court found the evidence legally insufficient to support termination of Silva's
parental rights under section 161.001(1). Having found the evidence legally
insufficient to support termination under section 161.001(1), the trial court did not
rule on whether the evidence is legally sufficient to show "that termination is in the
best interest of the child." See Tex. Fam. Code Ann. § 161.001(2). Having held that
the trial court did not err in finding the evidence insufficient to terminate Silva's
parental rights under section 161.001(1), we need not consider whether the evidence
was legally sufficient to show that termination was in the best interest of the child. 
See id. § 161.001.

 We overrule DFPS's third issue.

Conclusion

 We affirm the judgment of the trial court.



 


 Terry Jennings

 Justice


Panel consists of Justices Jennings, Keyes, and Higley.
1. DFPS is currently the sole managing conservator of the child. See Tex. Fam. Code
Ann. § 153.371 (Vernon 2008) (listing rights and duties of non-parent appointed as
sole managing conservator).
2. DFPS had attempted to terminate Silva's parental rights under section 161.001 of the
Texas Family Code. See id. § 161.001(1)(D), (E), and (O) (Vernon 2008). After
ruling in Silva's favor on his motion for directed verdict, and based on the jury's
findings, the trial court appointed Silva permanent possessory conservator of the
child. See id. § 153.074 (Vernon 2008) (listing rights and duties of parent during
period of possession); §§ 153.191-93; 153.251-58 (Vernon 2002) (listing guidelines
for appointing parents possessory conservators and guidelines for such parents).
3. See id. § 161.001(1)(D).
4. See id. § 161.001(1)(E).
5. See id. § 161.001(1)(O).
6. See id. § 161.001(2) (Vernon 2008).
7. See id. § 262.104 (Vernon 2008) (allowing DFPS to take possession of child without
court order "on personal knowledge of facts that would lead a person of ordinary
prudence and caution to believe that there is an immediate danger to the physical
health or safety of the child").
8. See id. § 262.104 (Vernon 2008) (authorizing DFPS to take possession of child
without court order under specified emergency conditions).
9. Nevertheless, Allison remained the court-ordered primary conservator of the child
until 2006.
10. DFPS removed the child from Allison in March 2006. However, DFPS also removed
the child from Silva in October 2007 after he left the child in the care of Allison. No
evidence indicated that by doing so Silva neglected or abused the child such that
DFPS could have removed the child under chapter 262 of the Texas Family Code. 
See Tex. Fam. Code Ann. § 262.104(a) (authorizing DFPS to take possession of 
child without court order on knowledge of facts that would lead person of ordinary
prudence and caution to believe that there is immediate danger to the physical health
and safety of child, that child is victim of sexual abuse, or that person who has
possession of child is placing child in immediate danger by using illegal controlled
substance). However, we need not address this removal because by not raising this
issue in its briefing, DFPS has waived this issue. See Tex. R. App. P. 38.1(h).