Opinion issued January 12, 2012



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-11-00316-CV

———————————

A.A.,
Appellant

V.

Department
of family & protective services, Appellee



 



 

On Appeal from the 306th District Court

Galveston County, Texas



Trial Court Case No. 09CP0101

 



 

MEMORANDUM OPINION

          In
this accelerated appeal,[1] appellant, A.A., challenges
the trial court’s decree, entered after a jury trial, terminating his parental
rights to his minor child.  In his first three
issues, appellant contends that the evidence is legally and factually
insufficient to support the jury’s findings that he knowingly placed or
knowingly allowed his child to remain in conditions or surroundings that
endangered the child’s physical or emotional well-being,[2] he engaged in conduct or
knowingly placed his child with persons who engaged in conduct that endangered the
child’s physical or emotional well-being,[3] and termination of his
parental rights was in the best interest of the child.[4]  In his fourth and fifth issues, appellant
contends that a rule 11[5] agreement that he had
previously entered with appellee, the Department of Family and Protective
Services (“DFPS”), “should have been upheld or honored under contract law” and
he received ineffective assistance of counsel. 

We affirm.

Background

          On
December 7, 2010, the trial court conducted a custody hearing at which the
parties notified the trial court that DFPS had signed a rule 11 agreement with
the child’s aunt, C.P., a paternal uncle, A.N., and appellant.  The parties agreed that C.P. and A.N. would
be appointed the child’s permanent managing conservators and appointing
appellant and N.P., the child’s mother, as managing conservators would not be
in the child’s best interest because such an arrangement would significantly
impair the child’s physical health or emotional development.  The parties further agreed that appellant and
N.P. would be appointed as possessory conservators, but appellant and N.P.
could only have supervised visits with the child.  Neither appellant nor N.P. could supervise
each other’s visits with the child.  The
parties also presented evidence in support of the requested appointments.  Much of this evidence concerned N.P.’s use of
narcotics, domestic violence between appellant and N.P., and the suitability of
C.P. and A.N. as conservators.  At the
end of the custody hearing, the trial court stated that, in accordance with the
rule 11 agreement, it would appoint C.P. and A.N. as permanent managing
conservators of the child.  

Subsequently, on December 14, 2010,
DFPS and the child’s guardian ad litem filed a Joint Motion for New Trial on
the basis of “newly discovered evidence.” 
DFPS noted that, almost immediately after the December 7 hearing, it had
learned that A.N. had defrauded the trial court and the ad litem by providing
false testimony concerning his intent to raise the child with C.P.   DFPS explained that, within days of the
hearing, A.N. had left C.P. for another woman, E.R., with whom he had been
having an undisclosed relationship.  DFPS
also noted that A.N. had taken the child away from C.P. in violation of the
rule 11 agreement and had brought the child back to the home from which he had
been removed.  DFPS attached affidavits
of C.P. and Sean Brewster, a DFPS case worker, in support of the joint
motion.  

The trial court, on January 10,
2011, entered an “Agreed Order” on the joint motion for new trial, noting that
all parties, including appellant, had agreed to a new trial pertaining to the
child.  On March 30, 2011, a jury trial
commenced in which DFPS sought to terminate the parental rights of appellant
and the mother, N.P.  Nothing in the
record demonstrates that appellant objected to the proceedings or contended
that the rule 11 agreement barred DFPS’s continuing suit against him.

At trial, appellant testified that
he had not seen the child, who was then approximately six-years old, for
fourteen months due to the fact that he had been incarcerated as a result of
being convicted of “assault crimes” against N.P.  He admitted that these offenses involved
“bodily injury” and allegations that he had used “a deadly weapon” in
committing them.  Appellant explained
that he had met N.P. around 2004, when she was “on the streets”
“prostituting.”  Several months after meeting
her, appellant learned that she had become pregnant with his child.  In 2005, he lived with the child at his home,
and N.P., who he knew was addicted to crack cocaine, would “come and go” from
the home.  Appellant noted that his
relationship with N.P. was “on again off again” and “good” until she “started
fiending for drugs” “constantly.”  

In November 2005, appellant was
arrested for intentionally threatening N.P. “with imminent bodily injury by
holding a handgun” to her head and “placing [the] handgun in [her] mouth” while
“threatening to kill” her.  He, however,
asserted that he had pleaded guilty to a “lesser offense,” adjudication of his
guilt was deferred, and he was placed on community supervision.  Appellant disputed N.P.’s deadly weapon
allegation and asserted that he had simply kicked N.P. “in the butt” to get her
out of the house after she had sought “money for crack.”  He had explained to a police officer who had
responded to the domestic assault that a fight had erupted between him and N.P.
after the child had stepped on a crack pipe in the house and sustained an
injury to his foot.    

Appellant agreed that he knew that
N.P. had a narcotics problem in 2005 and, at the time of his arrest for
assaulting N.P. in 2005, he had sold narcotics from his house.  He conceded that he had kept marijuana,
Xanax, Hydrocodone, Soma, Trazodone, and Seroquel in the house.  Appellant explained that he had obtained
these drugs from a doctor and a health care pain management clinic.  He further explained that these drugs were
for his injuries, but he also agreed that he had been “stockpiling” the Xanax
and selling marijuana and other drugs. 
And he had kept a book to track his narcotics sales.  Appellant admitted that it was dangerous to
sell narcotics out of his house with his one-year old child present and his
conduct had endangered the child.  He
also agreed that he had personally used marijuana and other prescription drugs
to “settle” his “nerves” anytime N.P. was around so that he could control his
“emotion.”  He also conceded that he had
a “temper,” especially when the mother was “around.” 

In 2006, appellant’s mother, N.A.,
obtained custody of the child through a court order that provided that
appellant and N.P. could have only supervised visits with the child at N.A.’s
home.  The order also restrained
appellant from being present during N.P.’s visits.  Appellant agreed that it was better for his
and N.P.’s visits to be supervised by N.A. 
Nevertheless, the parties subsequently entered into an agreed modified
custody order giving appellant custody of the child and providing that he would
supervise N.P.’s visits with the child. 
Even though he had signed the order acknowledging its terms, appellant
stated that it was not what he wanted. 
He agreed that the custody order was not in the best interest of the
child because it was not a “good idea” for a parent with a history of domestic
violence to supervise the visits of another parent who was a cocaine
addict.  

Appellant further testified that
between 2005 and 2009, there were incidents of “domestic violence” between him
and N.P. “all the time” and he felt like N.P. was endangering the child with
her conduct.  During the 2009 assault,
appellant had shoved N.P. out of his house and “slammed the door in her face.”  Prior to that incident for which appellant was
incarcerated, there were “many other[]” incidents related to N.P.’s “fiending
for drugs.”  Appellant noted that he had
called for emergency assistance in regard to N.P. on several occasions, but he
asserted that he had never called Child Protective Services (“CPS”) to help
protect the child from N.P., despite the fact that N.P. had continued to use
crack cocaine “on and off again” between 2005 and 2009.  

Appellant also admitted that,
during this time, he had dated other prostitutes, including two since the birth
of the child.  He agreed that a lot of
these women were narcotics users, but he stated that he had “dated” the women
at hotels.  When asked if he wanted his
child to grow up believing that this is how people should “date,” appellant
stated that he wanted his child “to know the truth.”  

Appellant further explained that he
had been incarcerated since his December 25, 2009 arrest and, prior to his
incarceration, he had been living in his house with the child, N.A., and his
brother, A.M., who was “a chronic alcoholic.” 
N.P. also lived at the house sometimes and, even though appellant did
not want N.P. to take the child away from the house by herself, she would
sometimes “take off on her own” with the child without his knowledge.  Appellant knew that there was a court order
that required N.P.’s visits with the child to be supervised, but he explained
that he could not control this while he was at work.  As a result, appellant disobeyed the court
order.  He conceded that N.P., as a crack
addict, could have hurt the child, and he knew that N.P. had previously had two
of her other children taken by CPS.

Appellant further testified that,
as of December 25, 2009, N.P. had been living at his house for three months,
and she had been doing well.  However,
shortly before Christmas, he learned that N.P. was using narcotics again.  On Christmas Day, a fight erupted, and N.P.
started screaming and yelling when appellant refused to give her money for
crack cocaine.   He stated that he threw
N.P. out of his house and slammed the door in her face.  Appellant knew “somewhat that [N.P.] was
hurt,” and he heard her crying.  He also
agreed that photographs of N.P.’s injuries, taken after the assault, depicted
“a whole lot of blood.”  Appellant
explained that, at the time of the assault, N.A. and A.M. were also present in
the house, and N.A. had tried to stop him from assaulting N.P.

Appellant agreed that he had
previously given N.P. “a lot of money for diapers” to get her out of the house,
even though he “knew” that she was using the money to buy crack cocaine.  When asked why, based upon her past conduct
and narcotics addiction, he had allowed N.P. into the house, appellant stated
that it was difficult not to because the child and N.P. were attached.   He also explained that he had tried to help
N.P. and there had been extended periods of time in which she remained
“clean.”   Also, appellant believed that
it would have harmed his child to keep him from N.P.   Appellant noted that, before the incident in
2009, N.P. had been “clean” for six months, and she had promised not to use
narcotics.

Appellant explained that, as a
result of the 2009 incident, he was charged with the criminal offense of
aggravated assault and endangering a child, and he agreed that it “would harm a
child emotionally” to witness domestic abuse against his mother.  He noted that he entered into a plea
agreement with the State, which dismissed the case against appellant for endangering
the child.  Appellant was then convicted
of “assault causing bodily injury, family violence” and sentenced to
confinement for two years.  

Appellant further testified that he
had previously attended mediation in the DFPS case regarding his child and, at
this mediation, he had entered into an agreed temporary order, which required
him to take “batterer’s intervention” and anger management courses.  However, he had failed to complete these
courses.  Appellant explained that when
he was released from incarceration, he intended to return to the same house,
where his mother, N.A., and his two brothers, A.M. and A.N., now lived.   

Appellant agreed that the child had
“been dealing with this stuff” between he and N.P. ever since the child’s birth
and that CPS had been involved in the child’s life on multiple occasions—at the
child’s birth, after the 2005 domestic assault, and after the 2009 domestic
assault.  He agreed that the child had
been through several emotionally “bad experiences” as a result of his
relationship with N.P., the “drug issues,” and the “arrest issues.”  Appellant also admitted that he had
previously threatened to kill N.P.  

Appellant noted that, except for
the time that he had been incarcerated, he had provided for the child.  However, he conceded that he had supported
the child, in part, by selling narcotics.  
He noted that it was his understanding that he could complete some of
the court-ordered family service plan after his release, he had taken some
anger management classes before trial, and he had learned methods to calm
himself.    

Appellant noted that C.P. had
provided the child with a good home, his brother, A.N., had been married to
C.P. at the time of the December 2010 custody hearing, and A.N. and C.P. had
reached a custody agreement with CPS. 
However, two days after taking custody, A.N. took the child from C.P. and
returned to N.A.’s house.  Appellant agreed
that A.N.’s conduct after the December 2010 custody hearing was harmful to the
child, C.P. has acted in the child’s best interest, he liked C.P., he believed
his child was safe with C.P., and the child’s needs would be met by C.P.

DFPS investigator E. Gonzalez
testified that on December 25, 2009, she received a referral regarding the
child, who was five years old at the time, for physical neglect and neglectful
supervision by both the mother and father. Gonzalez met with appellant on
December 28, 2009, and he told her that the December 25, 2009 “incident” was
caused by the mother’s abuse of crack cocaine and valium, and he admitted to
committing a previous domestic assault in 2005. 
Gonzalez met with N.P. on December 29, 2009, and N.P. explained to her
that appellant had “beat the crap out of her,” and she had suffered from a
broken nose, fractured jaw, and fractured back. 
Gonzalez noticed injuries on the face of N.P., who explained that she
was holding the child at the time of the assault and appellant began slinging
her around while she held the child in her hands.  During the assault, the child told N.P. that
they should “get out of here,” and the child was with N.P. during most of the
assault.  Appellant then grabbed the
child by his jacket, “threw him inside” the house, and slammed the door.  N.P. stated that she was not using narcotics
at the time and had been “clean” for five to six months when appellant
assaulted her.  N.P. did not appear to
Gonzalez to be “using” narcotics at the time of the interview.  Gonzalez also spoke with N.A., who stated
that appellant “beat up” N.P.  Gonzales
learned that the child had been taken to the house of N.P.’s parents, and she
opined that this was not acceptable because N.P.’s stepfather was “a registered
sex offender” and N.P. was listed “as the victim.”   On December 30, 2009, DFPS took custody of
the child for a variety of reasons, including the child’s witnessing of the
domestic violence, the narcotics use, the family’s recurring history with DFPS,
the condition of the home, and the fact that the child was residing with a
registered sex offender.  

          Texas
City Police Officer M. Johnson testified that he was dispatched to appellant’s
house on a call for emergency assistance on December 25, 2009.  When he arrived, Johnson found N.P. “covered
in blood,” with injuries all over her face, and in a fetal position.  N.P. told Johnson that appellant had
assaulted her.  Johnson met with appellant
at the scene, and he told Johnson, “It’s my fault,” and he put his hands behind
his back.  Appellant, who was on
community supervision for a prior aggravated assault of N.P., admitted to
pushing N.P. because she was trying to obtain money to buy crack cocaine, and
Johnson arrested appellant.  Johnson
noted that N.P. complained of unbearable pains in her back, she “could barely
lift her head” or sit up, her “front teeth were overlapping her bottom teeth,”
and her lower jaw was pushed out of place. 
N.P. told Johnson that appellant is “extremely violent” and he had
assaulted her in the past.  N.P.
explained that appellant had grabbed her hair and punched her in the head while
she was holding the child.  He went “out
of control,” and N.P. thought he was “going to crush her head.”  N.A., appellant’s mother, came into the room
and tried to pull him off of N.P., and he told N.A. that he “might as well
kill” N.P.  Johnson stated that N.P.’s
injuries were not consistent with appellant’s statement that he had simply
pushed N.P.  Johnson also noted that the
condition of the home and the violence in the home rendered it an unsafe place
to raise a child, so he contacted CPS. 
Johnson subsequently spoke with a nurse who treated N.P., and the nurse
informed Johnson that N.P. suffered from a broken nose and back.  Johnson also assisted N.P. in obtaining an
emergency protective order against appellant. 

          Sean
Brewster, a DFPS case worker, explained that after being assigned the case in
January 2010, he developed a family service plan.  Brewster noted that appellant was
incarcerated, but he stated that other parents have obtained anger management
and parenting classes while incarcerated. 
He noted that appellant had not provided him with any certificates of
completion of such courses.  Brewster
explained that since the incident and being removed from appellant’s custody,
the child’s behavior had improved and the child had begun to talk again.  Brewster noted that the child also no longer
had “frequent night terrors,” from which he “would wake up crying and screaming”
and afraid that “his dad was going to come kill him.”

Brewster noted that the child had
been placed with the paternal uncle, A.N., and his aunt, C.P., who were
common-law married and had been together for sixteen years.  In December 2010, at a custody hearing, DFPS
had recommended that C.P. and A.N. be awarded permanent managing
conservatorship of the child.  However,
immediately following the hearing, DFPS learned that A.N. had left C.P. for his
cousin’s wife, E.R., and he took the child with him.  Brewster also learned that E.R. had already
voluntarily relinquished her own children “due to drugs” and that A.N. had
brought the child to the house where appellant had lived before being
incarcerated.  Based upon this
information, DFPS requested a new trial, which the trial court granted.  

Brewster noted that A.N. had not
appeared at a subsequent permanency hearing after the granting of the new
trial, and N.P. had since relinquished her parental rights to the child.  Brewster opined that it was in the child’s
best interest to terminate appellant’s parental rights because he had knowingly
allowed his child to be endangered and he was currently incarcerated and could
not care for him.  Brewster noted that
C.P. had a family support system, a brother who is a police officer, and a
niece with two children with whom the child played. He explained that it was
DPFS’s intent for C.P to adopt the child. 
Brewster noted that the child is very bonded to C.P. and she provides
the child with the first stable situation in his life.  

Galveston County Sherriff’s Deputy
D. Macik testified that on November 9, 2005, police officers responded to a
domestic disturbance between appellant and N.P. 
Macik subsequently went to the house, searched it, and conducted an
inventory. Inside, he discovered a .9 millimeter pistol, a green plastic baggy
containing a substance believed to be marijuana, a large number of other
containers containing a substance that appeared to be marijuana, multiple other
narcotics, including Hydrocodone and Xanax, and drug paraphernalia, prescription
bottles, medications, and a grinder that was “probably used to grind up the
marijuana.”  Macik opined that it was a
danger for the child to be around “all of these items.”  Macik also noted that, during a videotaped
statement, appellant stated that the child had cut his foot when he stepped on
a crack pipe in the house.   After Macik
concluded his investigation, the State charged appellant with assault, causing
bodily injury, and aggravated assault with a deadly weapon.  Macik agreed that N.P. appeared to be under
the influence of a substance at the time he interviewed her.

The jury found that appellant’s
parental rights should be terminated.  In
its decree terminating appellant’s parental rights, the trial court found that
appellant had knowingly placed or knowingly allowed his child to remain in
conditions or surroundings that endangered the child’s physical or emotional
well-being;[6] he
had engaged in conduct or knowingly placed his child with people who had engaged
in conduct that endangered the child’s physical or emotional well-being;[7] and termination of his
parental rights was in the best interest of the child.[8]

Sufficiency of the Evidence

In his first two issues, appellant
argues that because the “the less than ideal” living situation for his child
“stemmed from [N.P.’s] drug use” and appellant “was making the best of a
difficult situation” in regard to N.P.’s “instability, lies, and manipulations,”
the evidence is legally and factually insufficient to support the jury’s
findings that he had knowingly placed or knowingly allowed his child to remain
in conditions or surroundings that had endangered the child’s physical or
emotional well-being and that he had engaged in conduct or knowingly placed his
child with persons who had engaged in conduct that endangered the child’s
physical or emotional well-being.  See Tex.
Fam. Code Ann. §§ 161.001(1)(D),
161.001(1)(E) (Vernon Supp. 2011). 
Appellant asserts that he “was not aware of the potential for danger” to
his child and he never “admit[ted] that there was actual violence’” between him
and N.P.

In his third issue, appellant
argues that the evidence is legally and factually insufficient to support the
jury’s findings that termination of his parental rights was in the best
interest of the child because “the child will not have a legal father” as a
result of the termination, he has been the “primary caretaker” of the child for
most of his life, and “his behavior came directly as a result of his despair
over N.P. having his child in the home of a registered sex offender” and her
use of narcotics.  See id. § 161.001(2).

Standard of Review

A parent’s right to “the
companionship, care, custody, and management” of his children is a
constitutional interest “far more precious than any property right.” Santosky v. Kramer, 455 U.S. 745, 758–59,
102 S. Ct. 1388, 1397 (1982) (internal citation omitted). The United States
Supreme Court has emphasized that “the interest of parents in the care,
custody, and control of their children is perhaps the oldest of the fundamental
liberty interests recognized by this Court.” Troxel v. Granville, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000).  Likewise, the Texas Supreme Court has also concluded
that “[t]his natural parental right” is “essential,” “a basic civil right of
man,” and “far more precious than property rights.”  Holick
v. Smith, 685 S.W.2d 18, 20 (Tex. 1985).  Consequently, termination proceedings should
be strictly scrutinized.  Id. (emphasis added). 

Because termination “is complete,
final, irrevocable, and divests for all time that natural right . . . , the
evidence in support of termination must be clear and convincing before a court
may involuntarily terminate a parent’s rights.”  Id.
(citing Santosky, 455 U.S. at 747–48,
102 S. Ct. at 1391–92; Richardson v.
Green, 677 S.W.2d 497, 500 (Tex. 1984)).  Clear and convincing evidence is “the measure
or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.”  Tex. Fam. Code Ann. § 101.007 (Vernon 2008); In re J.F.C., 96 S.W.3d 256, 264 (Tex. 2002).
 Because the standard of proof is “clear
and convincing,” the Texas Supreme Court has held that the traditional legal
and factual standards of review are inadequate.  In re
J.F.C., 96 S.W.3d at 264–66.

In conducting a legal-sufficiency
review in a parental-rights termination case, we must determine whether the
evidence, viewed in the light most favorable to the finding, is such that the
fact finder could reasonably have formed a firm belief or conviction about the
truth of the matter on which DFPS bore the burden of proof.  See id.
at 266.  In viewing the evidence in the
light most favorable to the finding, we “must assume that the fact finder
resolved disputed facts in favor of its finding if a reasonable fact finder
could do so,” and we “should disregard all evidence that a reasonable fact
finder could have disbelieved or found to be incredible.”  In re
J.P.B., 180 S.W.3d 570, 573 (Tex. 2005) (citing In re J.F.C., 96 S.W.3d at 266).

In conducting a factual-sufficiency
review in a termination-of-parental-rights case, we must determine whether,
considering the entire record, including both evidence supporting and evidence
contradicting the finding, a fact finder reasonably could have formed a firm
conviction or belief about the truth of the matter on which the State bore the
burden of proof.  Id.; In re C.H., 89
S.W.3d 17, 25 (Tex. 2002).  We should
consider whether the disputed evidence is such that a reasonable fact finder
could not have resolved the disputed evidence in favor of its finding.  In re
J.F.C., 96 S.W.3d at 266–67.  “If, in
light of the entire record, the disputed evidence that a reasonable fact finder
could not have credited in favor of the finding is so significant that a fact
finder could not reasonably have formed a firm belief or conviction, then the
evidence is factually insufficient.”  In re H.R.M., 209 S.W.3d 105, 108 (Tex.
2006).

In proceedings to terminate the
parent-child relationship brought under section 161.001, DFPS must establish,
by clear and convincing evidence, one or more of the acts or omissions enumerated
under subsection (1) of section 161.001 and that termination is in the best
interest of the child.  Tex. Fam. Code Ann. § 161.001 (Vernon
Supp. 2011).  Both elements must be
established, and termination may not be based solely on the best interest of
the child as determined by the trier of fact. 
Tex. Dep’t of Human Servs. v. Boyd,
727 S.W.2d 531, 533 (Tex. 1987). “Only one predicate finding under section
161.001(1) is necessary to support a judgment of termination when there is also
a finding that termination is in the child’s best interest.”  In re
A.V., 113 S.W.3d 355, 362 (Tex. 2003).

Endangerment

A court may terminate the
parent-child relationship if the court finds by clear and convincing evidence
that the parent has knowingly placed or knowingly allowed the child to remain
in conditions or surroundings that “endanger” the physical or emotional
well-being of the child. Tex. Fam. Code
Ann. § 161.001(1)(D).  “Endanger”
means to expose to loss or injury or to jeopardize.  Boyd,
727 S.W.2d at 533 (Tex. 1987); Ruiz v.
Tex. Dep’t of Family and Protective Servs., 212 S.W.3d 804, 814 (Tex. App.—Houston
[1st Dist.] 2006, no pet.).  The term
means “more than a threat of metaphysical injury or the possible ill effects of
a less-than-ideal family environment.”  Boyd, 727 S.W.2d at 533; Ruiz, 212 S.W.3d at 814.  However, it is not necessary that the conduct
be directed at the child or that the child actually suffer injury.  Boyd,
727 S.W.2d at 533; Ruiz, 212 S.W.3d at
814.   “[I]t is necessary to examine
evidence related to the environment of the child to determine if the
environment was the source of endangerment to the child’s physical or emotional
well-being.”  Ruiz, 212 S.W.3d at 815 (citations omitted); see also In re D.J.J., 178 S.W.3d 424, 429 (Tex. App.—Fort Worth
2005, no pet.) (“The phrase ‘conditions or surroundings’ in section
161.001(1)(D) refers only to the acceptability of the child’s living conditions
and does not concern the conduct of the parents toward the children”).

Here, DFPS presented evidence that
between 2005 and 2009 the child lived in a home out of which appellant, his
father, was selling narcotics.  Following
the domestic assaults in 2005, police officers located large quantities of narcotics
inside the house, and appellant admitted that he had sold marijuana, Xanax, and
other narcotics.  And he used the money
from the sales of  narcotics as a means
of support.  Appellant agreed that
raising the child in a house from which he sold narcotics endangered the
child.  Moreover, in addition to selling
narcotics, appellant conceded that he had used marijuana and other prescription
drugs to “settle” his “nerves” and to control his “emotion” and temper,
especially when N.P. was around the house or using narcotics.

Appellant also agreed that during
the time period between 2005 and 2009, and contrary to the terms of a court
order, he had allowed N.P., whom he knew to be a recurring crack-cocaine addict
and prostitute, to live in the house with him and his child.  Although appellant was concerned about N.P.
having the child without supervision, he admitted that he had allowed her to be
with the child when he had to go to work. 
He agreed that N.P. would sometimes “take off on her own” with the
child, and he was concerned that the child could be hurt while left in an
unsupervised environment with N.P. 
Appellant also knew that N.P. had previously had two of her other
children taken from her by CPS.  Also,
appellant admitted that he had never contacted CPS to seek assistance in
preventing N.P. from having unsupervised access to the child, noting that the
child was attached to N.P.  He also
agreed that over the course of his relationship with N.P., he had given her “a
lot of money for diapers,” even though he “knew” that she would use the money to
buy crack cocaine.

DFPS also presented evidence that
from the time of his birth until his removal from appellant’s house in 2009,
the child lived in an emotionally damaging environment resulting from ongoing
domestic assaults and disputes between appellant and N.P.  DFPS introduced testimony and documentary
evidence detailing the 2005 incident in which appellant had assaulted N.P. in
the presence of the child.  Appellant
agreed that the child had been living in an environment of continuing domestic
disturbances all of his life, and he admitted to having threatened to kill N.P.
on one occasion.  In regard to the 2009
assault, DFPS presented substantial testimony that the child was emotionally
damaged as a result of appellant’s extremely violent assault of N.P.  DFPS presented photographs of N.P.’s
significant injuries, as well as testimony from a police officer who had
personally observed the injuries.  All of
this evidence refuted appellant’s explanation that he had simply pushed or
shoved N.P. outside of the house. 
Officer Johnson specifically stated that the injuries sustained by N.P.
were not consistent with appellant’s explanation of the event.  There was testimony that during this assault,
the child was in N.P.’s arms being “slung” around and that N.P. dropped the
child while being assaulted.  The child
also pleaded with N.P. to get “out of here.” 
Brewster testified that after being removed from appellant’s house, the
child suffered from night terrors from which the child would awake screaming
that appellant was going to “kill” him.  

From this evidence, the jury could
have reasonably concluded that appellant had placed the child in an endangering
environment and allowed the child to remain in an endangering environment
marked by constant domestic disturbances and assaults.  Although appellant presented some conflicting
evidence, and he stressed that there were only two specific incidents of
domestic assaults to which law enforcement authorities responded, the jury
could have disbelieved his testimony. 
Moreover, appellant’s testimony and the testimony of the case workers
and police officers would have permitted the jury to find that the house in
which the child was being raised was a violent environment that endangered the
child’s physical and emotional well being.  
As appellant agreed, the child was being raised in an environment with
domestic assault and narcotics issues, which created an emotionally damaging
environment for the child.

We hold that the evidence is
legally and factually sufficient for a reasonable fact finder to form a “firm
belief or conviction” that appellant had knowingly placed or knowingly allowed
the child to remain in conditions or surroundings that endangered his
well-being and the trial court did not err in terminating appellant’s parental rights
on the ground that he had violated section 161.001(1)(D) of the Texas Family
Code.  Having held that the evidence is sufficient to
support a finding of termination under section 161.001(E), we need not consider
appellant’s second issue, in which he challenges the sufficiency of the
evidence to support a finding of termination under section 161.001(E).   See
In re A.V., 113 S.W.3d at 362.

We overrule appellant’s first
issue.

 

Best Interest          

In determining whether the termination
of appellant’s parental rights was in the child’s best interest, we may
consider several factors, including (1) the child’s desires, (2) the current
and future physical and emotional needs of the child, (3) the current and
future physical danger to the child, (4) the parental abilities of the person
seeking custody, (5) whether programs are available to assist the person
seeking custody in promoting the best interests of the child, (6) plans for the
child by the person seeking custody, (7) the stability of the home, (8) acts or
omissions of the parent that may indicate that the parent-child relationship is
not proper, and (9) any excuse for acts or omissions of the parent.  Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976); In re L.M., 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.]
2003, no pet.).  The Holley factors are not exhaustive, and there is no requirement that
DFPS prove all factors as a condition precedent to parental termination.  See In
re C.H., 89 S.W.3d at 27.

In regard to the child’s desires,
the child did not testify or speak directly to the trial court. However,
Brewster testified that upon removal from appellant’s house, the child was
experiencing “night terrors” from which he would awake, screaming that appellant
would kill him.  Brewster reported that
at the time of trial, the child was no longer experiencing these terrors.  In regard to the child’s current and future
physical and emotional needs, Brewster testified that, upon removal from
appellant’s house, the child was not talking. 
Brewster noted, however, that with his current placement with C.P., the
child was talking again at school. 
Brewster stated that the child’s behavior had improved “180” degrees and
his school was accommodating his speech issue. 
Additionally, appellant agreed that C.P. was meeting the needs of the
child and was providing the child a stable and safe home.  In regard to the current and future physical
danger to the child, appellant agreed that C.P. provided the child with a safe home.  In contrast, there is evidence that while
living with appellant, the child was living in a home from which appellant sold
narcotics.  And appellant allowed N.P.,
whom he knew to be a crack-cocaine addict that was using narcotics “on again”
and “off again,” to live in the home with the child and have unsupervised
visits with him.  Such visits were
contrary to a court order.  In fact, N.P.
was taking the child away from the house on her own, and appellant admitted
that this had endangered the child.  There
is also evidence that the child was present during at least two violent
physical assaults on N.P. and was in N.P.’s arms being “slung around” during
the 2009 assault.  Appellant also agreed
that the child had been living in this environment since his birth, there were
recurring domestic disputes in the home, and this environment emotionally
harmed the child.  

In regard to the parental abilities
of appellant, there is evidence that he provided for and took care of the
child’s medical needs and served as the primary caretaker for a number of
years.  However, there is also evidence
that appellant had sold and used narcotics in the child’s presence, permitted
the child to live in a dangerous environment with a chronic alcoholic brother
and a crack-cocaine addicted mother, and committed several domestic assaults,
including at least two violent assaults to which police officers
responded.  There is also evidence that,
after the 2009 assault, appellant picked up the child and “threw” him inside
the house. In contrast, although C.P. did not personally testify, DFPS
presented undisputed evidence that she had provided the child with the first
stable situation in his life and the child and C.P. were “very bonded.”  In regard to programs available to assist appellant,
he provided testimony that he intended to complete certain classes upon his
release from incarceration and he had already learned some calming methods
during anger management.  However, there
is evidence that appellant was provided with a family service plan that
required him to complete classes that he failed to complete.  In regard to plans for the child, appellant
testified that when released from incarceration, he intended to look for
welding work.  However, there is also
evidence that appellant had been injured and, prior to incarceration, he
supported his family, at least in part, by selling narcotics.  

In regard to the stability of the
home, there is undisputed evidence that C.P. provided a stable home. In
contrast, the jury heard ample evidence that, up until being taken into DFPS’s
custody, the child lived in a very unstable environment involving recurring and
frequent narcotics issues with N.P. and domestic assault issues between N.P.
and appellant   The jury also heard ample
evidence concerning appellant’s  acts and
omissions indicating that the parent-child relationship was not proper.  Although appellant argues that his physical
behavior with N.P. was attributable to her narcotics issues, the jury received
conflicting evidence on this matter.  DFPS also presented substantial evidence from
which the jury could have discredited appellant’s testimony that he did not
violently assault N.P. and cause her to sustain serious bodily injury.  Instead, the jury could have reasonably
believed that appellant was an “extremely violent” person with a temper.  

We hold that the evidence is
legally and factually sufficient for a reasonable fact finder to form a “firm
belief or conviction” that termination of appellant’s parental rights was in
the child’s best interest.

We overrule appellant’s third
issue.

Rule 11 Agreement

In his fourth issue, appellant
argues that the trial court erred in terminating his parental rights because he
had previously entered into a rule 11 agreement with DFPS regarding the custody
of the child, his parental rights would not have been terminated under this
agreement, and this agreement should have been upheld or honored.  He asserts that “he never had actual
knowledge until the actual trial setting that DFPS was going to truly proceed
to terminate his parental rights.”

It is undisputed that after a
December 2010 custody hearing, the trial court signed a rule 11 agreement
entered into by appellant, DFPS, C.P., A.N., and the guardian ad litem
providing that C.P. and A.N. would be named permanent managing conservators of
the child.  However, it is further
undisputed that DFPS and the guardian ad litem filed a joint motion for new
trial based upon newly discovered evidence that A.N. took the child away from
C.P. within days of the hearing and returned him to appellant’s home.   The trial court then entered an agreed order
on this joint motion for new trial, granting a new trial of the case.  Appellant agreed to the terms of the order,
as did C.P. and A.N.   Appellant does not
dispute that DFPS’s petition to terminate his parental rights remained on
file.  

Appellant did not object before the
trial at which DFPS sought to terminate his parental rights.  Although appellant’s counsel raised the issue
of the rule 11 agreement during his closing arguments when he asked the jury to
“honor the contract” that appellant had with DFPS, appellant never contended in
the trial court that the rule 11 agreement precluded the granting of the joint
motion for new trial, to which he agreed, or barred DFPS from proceeding in its
suit to terminate his parental rights. 
We conclude that appellant has waived this issue for our review.  See
Tex. R. App. P. 33.1.

Moreover, to the extent that appellant
asks us to review the granting of the new trial, we note that such an order is
generally unreviewable.  Wilkins v. Methodist Health Care Sys., 160
S.W.3d 559, 563 (Tex. 2005) (“Except in very limited circumstances, an order
granting a motion for new trial rendered within the period of the trial court’s
plenary power is not reviewable on appeal.”).  Here, appellant expressly agreed to the new
trial, did not object once the new trial commenced, and never argued that the
rule 11 agreement barred DFPS from seeking to terminate his parental
rights.  Appellant has also not cited any
applicable authority for the proposition that the prior rule 11 agreement,
which only permitted him supervised visits with his child as a possessory
conservator, barred DFPS from proceeding in its suit to terminate his parental
rights.

We overrule appellant’s fourth
issue.

Ineffective Assistance of Counsel

In his fifth issue, appellant
argues that he received ineffective assistance of counsel because his trial
counsel did not present any exhibits, witnesses, or “a defense” on his behalf
and could have cross-examined more of the witnesses presented by DFPS.  Appellant notes that his counsel did not
object to the admission of exhibits and affidavits that contained hearsay,
including the affidavit of Gonzalez, the DFPS case worker.   He further notes that his counsel did not
raise any objections during the testimony of Officer Johnson even though his
testimony included hearsay.  Finally,
appellant asserts that the “greatest harm” related to his trial counsel’s
representation pertains to the rule 11 agreement.  He complains that his counsel could have
filed “a motion to enforce the rule 11 agreement” and “pleadings that addressed
the rule 11 agreement and included that issue before the jury.”

Proving ineffective assistance of
counsel requires a showing that (1) counsel made errors so serious that counsel
was not functioning as “counsel” guaranteed by the Sixth Amendment and (2) the
deficient performance of consul prejudiced the defense in a manner “so serious
as to deprive the defendant of a fair trial, a trial whose result is reliable.”
 In
re H.R.M., 209 S.W.3d at 111 (citing Strickland
v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052 (1984); In re M.S., 115 S.W.3d 534, 545 (Tex. 2003)).  In adopting the Strickland test for parental termination cases, the Texas Supreme
Court has explained that, “taking into account all of the circumstances
surrounding the case,” a court “must primarily focus on whether counsel
performed in a reasonably effective manner.”  Id.  A court “must give great deference to counsel’s
performance, indulging a strong presumption that counsel’s conduct falls within
the wide range of reasonable professional assistance, including the possibility
that counsel’s actions are strategic.” Id.
Challenged conduct constitutes ineffective assistance only when it is “so
outrageous that no competent attorney would have engaged in it.”  Id.  

Appellant is complaining primarily
that his trial counsel provided ineffective assistance by entering into the
agreed motion for new trial and not seeking enforcement of the rule 11
agreement to preserve his parental rights. 
However, there is no evidence that the trial court would not have granted
the new trial without appellant’s agreement. 
Appellant also has not cited any authority for the proposition that his
agreement was necessary for the trial court to grant the new trial, and
appellant has not challenged the “newly discovered evidence” that served as the
basis for a new trial.   Moreover, as
discussed above, appellant has not cited any authority for the proposition that
his entry into a rule 11 agreement, which awarded conservatorship of the child
to C.P. and A.N., would have precluded DFPS from subsequently seeking
termination of his parental rights in the new trial.  Accordingly, we conclude that appellant has
not demonstrated that his counsel provided ineffective assistance in regard to
the rule 11 agreement and the joint motion for new trial.

The record reveals that appellant’s
counsel participated extensively in voir dire proceedings and, during the
trial, he engaged in an in-depth examination of appellant and elicited
testimony that would have permitted the jury to find that appellant cared for
his son and had engaged in some of the conduct at issue to protect him from
N.P.’s use of narcotics.  Although
appellant admitted to physical altercations with and assaults of N.P., his
counsel presented a defense that appellant had not committed the assaults in
the violent manner alleged by DFPS. 
Counsel elicited testimony from appellant in which he acknowledged that
he had made mistakes in parenting.  But
counsel asked the jury to consider the fact that appellant had served as the
child’s primary caretaker, had financially supported the child and ensured that
he received medical care, and intended to care for the child upon his release
from incarceration.  The record reveals
that counsel’s focus at trial was to preserve appellant’s parental rights with
the possibility of his supervision of the child rather than obtaining
conservatorship of the child or removal of the child from placement with C.P.

Counsel also cross-examined
Brewster, Gonzalez, and Macik.  During
his cross-examination of Brewster, counsel obtained testimony that at least
some of the services required in the family service plan were not available to
persons who were incarcerated.  He also
agreed that appellant could have believed that he was to complete some of the
services upon his release for incarceration. 
Additionally, during cross-examination, Brewster admitted that it was
not unusual for a parent to complete domestic violence classes and get their
children returned to them.   During
counsel’s cross-examination of Gonzalez, counsel elicited testimony that would
have permitted the jury to believe that the poor physical condition of
appellant’s home might have been a temporary situation attributable to
Hurricane Ike.

Additionally, counsel presented a
closing argument in which he accepted that appellant had not been a “perfect
father,” but asked the jury to not terminate his parental rights because the
child still needed a father.  He also
stressed that appellant had tried to complete family-plan services while
incarcerated.  Finally, he asked the jury
to consider the fact that DFPS, in the rule 11 agreement, had previously agreed
to allow appellant to have visitation rights to the child.  

In regard to appellant’s complaint
about the admission of hearsay through various witnesses and documentary
evidence concerning the assault, we note that Officer Johnson and Gonzalez had
already provided substantial testimony concerning their direct observations of
N.P.’s severe injuries from the 2009 assault.   


Considering the circumstances
surrounding the case, none of appellant’s complaints, “individually or
combined, overcomes the strong presumption that counsel’s conduct falls within
the wide range of reasonable professional assistance.”  In re
H.R.M., 209 S.W.3d at 111.  Moreover,
appellant has not demonstrated that his counsel’s alleged failures to
cross-examine or present additional witnesses and exhibits “prejudiced the
case, deprived him of a fair trial, or produced an unreliable result.”  Id.  DFPS presented overwhelming evidence that
appellant had endangered the child and supported the termination of appellant’s
parental rights.  Accordingly, we hold
that appellant has not shown that he received ineffective assistance of
counsel. 

We overrule appellant’s fifth
issue.

 

Conclusion

          We
affirm the judgment of the trial court.

 

 

                                                                   Terry
Jennings

                                                                   Justice


 

Panel
consists of Justices Jennings, Sharp, and Brown.

 











[1]           See
Tex. Fam. Code Ann. § 263.405(a)
(Vernon Supp. 2011).

 





[2]           See
id. § 161.001(1)(D) (Vernon Supp. 2011).

 





[3]           See
id. § 161.001(1)(E) (Vernon Supp. 2011).





[4]           See
id. § 161.001(2) (Vernon Supp. 2011).

 





[5]           See
Tex. R. Civ. P. 11.





[6]           Id.
§ 161.001(1)(D).

 





[7]           Id. § 161.001(1)(E).





[8]           Id.
§ 161.001(2).