**Opinion issued December 3, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-24-00426-CV**

———————————

## IN THE INTEREST OF E.A.R. AKA A.E.R., A Minor Child

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case No. 2022-02168J**

## MEMORANDUM OPINION

In this appeal, appellant K. R. ("Mother") challenges the trial court's final decree, entered after a bench trial, terminating her parental rights to her minor child, E.A.R. ("Enzo").[1] Mother contends that the evidence is legally and factually insufficient to support the trial court's findings that she committed two statutory

---

[1]    We use an alias to refer to the minor child. *See* TEX. R. APP. P. 9.8(b)(2).

predicate grounds for termination of her parental rights. *See* TEX. FAM. CODE §§ 161.001(b)(1)(D), (E). We affirm.

## Background

In early December 2022, the Department of Family and Protective Services ("DFPS" or the "Department") filed a petition for the protection of Enzo. The Department sought managing conservatorship and termination of the parental rights of Enzo's mother and alleged fathers. The trial court issued a temporary order appointing the Department managing conservator of Enzo. The case proceeded to a bench trial in March and April 2024. At the conclusion of the trial, the court found that Mother had endangered Enzo by conduct and environment and that it was in Enzo's best interest to terminate Mother's parental rights.

The trial testimony included the following witnesses:

### A.    Harris County Deputy Constable K. Reyes

At trial, Harris County Deputy Constable K. Reyes testified that on December 5, 2022, he was dispatched to a daycare in response to a call about then-two-year-old Enzo. Enzo had multiple injuries all over his body. Deputy Reyes observed belt marks on Enzo's face, bruises, scratches, a burn, and an injured foot. Deputy Reyes identified photographs of Enzo's injuries. The photographs showed two lines going down Enzo's left cheek, a cut on his bottom lip and nose, and heavy bruising on his left glute and upper left back. Deputy Reyes opined that the

injuries appeared to be from spanking and that the bruise on the child's bottom was in the shape of an open hand. He testified that the two lines across Enzo's face and cheek were consistent with injuries caused by a belt and the belt buckle's prong. Deputy Reyes agreed that Enzo had injuries "from head to toe."

While at the daycare, Deputy Reyes interviewed Mother. She was calm and told him that Enzo had "smacked her in the face," so she spanked him. She described it as a light spanking with an open hand. When asked if Mother mentioned Enzo falling after a sudden stop while riding in the car, Deputy Reyes confirmed that Mother mentioned Enzo fell to the floor of the car because he was not secured in his car seat, causing some of his injuries. Deputy Reyes testified that Mother did not explain the other injuries.

Deputy Reyes testified that when he arrived on the scene, he was under the impression from the initial call that Mother's boyfriend had spanked Enzo. Once he spoke with Mother, Mother told him she was the one who spanked the boy. Deputy Reyes did not have contact information for the boyfriend and did not pursue an investigation of him.

## B. Daycare director

The daycare director testified that Enzo had attended the daycare for about two months before the incident, and she saw him daily. The director had worked in childcare for many years, yet she had never seen bruises like the ones Enzo had.

The bruises were first noticed by teachers who reported it to the director. The director then followed her usual documentation process.

The director testified that on the day of the incident, which was a Monday, a man had dropped Enzo off at the daycare. The director had not seen the man before. When she removed Enzo's clothing to inspect his injuries closer, she noticed that Enzo smelled strongly of urine and had not been properly cleaned. In her opinion, Enzo had not been properly cleaned for at least the weekend. Enzo was also limping. When she removed his shoe, he had a mark across his foot and a "busted" toe. She reported Enzo's injuries to the abuse and neglect hotline.

The director contacted Mother about 10:00 or 10:30 in the morning. Mother did not seem to want to talk to the director about the injuries. Mother said she was busy and would call back. After some time, the director called Mother again. Mother told the director that Enzo bumped his lip when he fell from a car seat. Mother said that Enzo was not secured in the car seat and fell when she stopped suddenly. The director expected Mother to come to the school after their call, but Mother did not come until the evening. When Mother arrived at the school, she was concerned that the director had called the police. Mother expected to leave school with Enzo that day, as a normal day. The director informed Mother that Enzo was not leaving with her because the police had been called.

4

The director and three other teachers met with law enforcement who responded to the daycare. The director told law enforcement that Mother had given two different stories about the injuries, and neither story accounted for all of Enzo's injuries. The director believed Enzo needed medical attention.

## C. Mother

Mother testified that she lived in New Jersey when Enzo was born. She met her boyfriend through Facebook. They talked for three years before she moved to Houston. They previously lived in the same area of El Salvador, but she did not know him when she lived there. She moved to Houston with Enzo in September 2022 to be with her boyfriend. She testified that she had not met her boyfriend in person before moving to Houston to live with him, and she had no other family in Houston. Typically, Enzo and Mother shared a king size bed in the bedroom and Mother's boyfriend slept on a mattress in the living room. Mother was employed at Fiesta, which was a ten-minute walk from her home. She got the job at Fiesta within a few weeks of moving to Houston. Enzo's daycare was also close by, only an eight-minute walk from her job if she walked quickly. At the time Enzo was removed, Mother had lived in Houston with her boyfriend for about three months.

During multiple days of testimony, Mother provided various accounts of Enzo's injuries and the weekend before Enzo was removed from her care.

### 1. Mother's testimony on March 8, 2024

On March 8, 2024, Mother testified that Enzo fell from a car seat on the Saturday before the daycare incident, which occurred on a Monday. She said that when her boyfriend was driving, the car took a sharp curve. Enzo hit the seat in front of him and fell to the side. She did not know if the car seat fell with Enzo because she was not looking, but the seat moved because it was not secured in the car. Enzo got himself up. His lip was hurt, and he had a "slight bruise" on his cheek. Mother testified that her boyfriend was mad and in a hurry. She asked her boyfriend to treat Enzo's lip injury.

When asked about the calls from the daycare, Mother testified that she missed two calls from the daycare director before she answered the phone. She answered on the third call and told the director that she was busy at work and would call back. Mother left the cash register at her job and went to the bathroom to call the daycare director. The director asked her what happened to Enzo. Mother only knew of the injury to his lip. She was unaware that he had other injuries at that point. Mother testified that the director said that Enzo had been beaten, but the director did not tell her that Enzo had injuries all over his body. Later, when asked why she did not walk to the daycare to check on Enzo after the director called, Mother responded that the daycare director only asked her what happened to Enzo, and Mother thought the daycare director was referring to Enzo's lip.

6

Mother testified that she never gave her boyfriend's contact information to law enforcement because they did not ask for it. She agreed that she told law enforcement that she had spanked Enzo causing mild injuries and that the injuries she observed on Enzo when she returned to the daycare were not mild. Mother was shown photographs and pointed to three red lines on Enzo's bottom as the area where she spanked Enzo.

A few minutes later, she testified that she told law enforcement that she spanked Enzo after he hit her but that it was a false statement. She explained that her boyfriend told her to tell law enforcement that she had spanked Enzo. The boyfriend told her that if she did not say that she had hurt Enzo, she would never see Enzo again, and she would be deported. She clarified that she never hit Enzo, it was just the explanation she gave to the officer.

On cross-examination, Mother agreed that she had changed her story as to who had spanked Enzo several times. She said that she initially told the daycare director that her boyfriend spanked Enzo. When law enforcement confronted Mother at the daycare, she told the deputy that she had spanked Enzo. When asked by the Department later that same day, she told the Department that she was the only one that had hit Enzo. She agreed that she was adamant it was not her boyfriend. Mother testified that she had undergone a psychological evaluation, and

7

she told the evaluator that her boyfriend had spanked Enzo. She testified that as of trial, her testimony is that her boyfriend caused Enzo's injuries.

She further testified that she worked in the afternoon on Sunday before the daycare incident. She got home late, and she saw Enzo briefly the next morning. On Monday, she was late to work. Her boyfriend took Enzo to daycare while she walked to work. She did not change Enzo's clothes that morning because he usually goes to bed in the clothes he will wear to daycare. Nobody changed Enzo's diaper before he went to daycare because "usually at the daycare they change the diapers." She testified that she was going to change Enzo's diaper, but her boyfriend told her to get to work quickly since she was late, and that the daycare would change him.

Mother testified that after she was released from jail, she returned to the home she shared with her boyfriend.[2] She continued to live in the home until June. She testified that she stopped the romantic relationship with her boyfriend, and he would come over to the house despite not living there. When asked if Enzo would have been exposed to the boyfriend if returned to Mother's care, Mother responded that if Enzo had been returned to her, she would have moved to New York. Mother testified that based on her service plan, she had completed online parenting courses

---

[2]     Mother was in jail for about four days.

8

and met with a therapist. Both had been helpful. She testified that her criminal case was still pending.

### 2. Mother's testimony on March 20, 2024

In later testimony on the March 20, 2024, Mother testified that she was home with Enzo all day on Saturday before he was removed. Mother saw no injuries on Enzo on Saturday. On Sunday, Mother played with Enzo during the morning until it was time for her to go to work. She needed to be at work between 2:30 and 3:30 p.m. Her boyfriend returned home thirty minutes before she left for work. The boyfriend drove her to work with Enzo in the car. She testified that she installed Enzo's car seat in the rear driver's side seat of her boyfriend's car. Mother testified that she did not spank Enzo on either Saturday or Sunday. She described the car seat incident as occurring on their way to her work that day. Enzo's lip was bleeding, and he had a slight bruise on his cheek. Her boyfriend was in a hurry, and she needed to go into work, so she asked him to address Enzo's lip when they got home. Enzo was not crying and did not tell her that he was hurting.

Mother testified that her boyfriend had watched Enzo alone on one occasion before that Sunday. She testified that she checked in with her boyfriend regarding Enzo by sending text messages or asking for photographs. On the Sunday before Enzo was removed, Mother was particularly busy at work, so she did not ask for photographs. She assumed everything would be fine because Enzo had stayed with

9

her boyfriend once before without incident. Mother walked home from work around 10:30 or 11:00 p.m. Enzo was already asleep. Mother did not turn the light on. She took a shower, changed clothes, and got in bed with Enzo.

Mother said that on Monday, December 5, 2022, she was running late. She woke up at the time she needed to leave for work. Her boyfriend offered to take Enzo to daycare for her. She thought it was strange but also that he was trying to help. She testified that Enzo typically sleeps in the clothes he will wear the next day to daycare. That morning, she asked her boyfriend to wait while she changed Enzo's diaper, but the boyfriend reminded her that the daycare could change it when they got there. Mother told Enzo goodbye and helped him put on shoes. She put Enzo's car seat in her boyfriend's car that morning and buckled Enzo into the car seat.[3] Her boyfriend drove her to work and then took Enzo to daycare.[4] It was the first time the boyfriend took Enzo to daycare.

Mother testified that she did not spank Enzo at any time Saturday through Monday. She said that she told law enforcement that she had spanked Enzo because she was afraid. She admitted that she had spanked Enzo once before,

---

[3] Mother also testified that she installed the car seat in her boyfriend's car on Sunday before he drove her to work.

[4] On March 20, 2024, Mother testified both that her boyfriend drove her to work on Monday December 5, 2022, and also that she walked to work that morning.

lightly, and that she hit him hard enough to leave marks. Her typical way of disciplining Enzo had been to lightly scold him, talking to him and refocusing him.

Mother testified that when she spoke with the daycare director by phone on Monday, December 5, 2022, the director asked her what happened to Enzo. Mother told the director about the car accident and mentioned the cheek and lip injuries. The director did not tell her about any other injuries. Mother next called her boyfriend. She spoke to him a few times throughout the day, and she did not feel more concerned for Enzo after the conversations. Talking to her boyfriend reminded Mother that he had told her that she needed to be harsher with her son and not give him everything he wanted.

After work, Mother dropped off a few groceries at her home before walking to the daycare. Her boyfriend was not home when she stopped by. Mother testified that she went to the daycare to pick up Enzo as she always does, but because they had called her, she had more reason to go to the daycare.

When Mother arrived at the daycare, the director brought her into an office with Enzo. Mother noticed the mark on Enzo's cheek was redder. The director also showed Mother some of the marks on Enzo's bottom. The director asked Mother, "Who did that to the child?" Mother responded that her boyfriend had taken care of Enzo the night before. Mother felt bad when she saw the marks on Enzo. Mother testified that the previous trial day was the first time she saw all of Enzo's injuries.

11

Mother testified that she spoke to a police officer at the daycare. He asked her who had hurt Enzo, and Mother responded that she had done so. She testified that she told the police officer that she had spanked Enzo because her boyfriend told her if she did not, that she would be sent away and never see Enzo again. Mother was arrested at the daycare and spent four days in jail. When she got home, she made it clear to her boyfriend that they were no longer in a relationship. She testified that her boyfriend would come to the house whether she was there or not. He sometimes slept in the living room and sometimes slept in the parking lot. She testified that her boyfriend made excuses for why he could not leave, such as that his name was on the lease. Mother got a second job so that she could pay for the house by herself. She then obtained a lease only in her name. She told the boyfriend to move out, but he continued to come to the home anyway. Mother said he would show up at night and often was at the house during the day when she was not there. Eventually, she moved far away from him. She began renting a room in a home. The owner also lives in the home with her partner and two daughters. Mother has her own bedroom and bathroom and can cook in the kitchen. Enzo would be welcome to stay in the home. Mother also saved money and bought her own car.

Mother testified that she completed the programs designated in her family service plan. She completed parenting classes and individual therapy. She

completed Brain Builders and Safe Babies programs. She testified that sometimes representatives from Safe Babies attended her visits with Enzo. She provided the Department with pay stubs and a copy of her lease.

Mother testified that she began having supervised visits with Enzo in August 2023. She brought small toys, bagels, and sweets for Enzo. During visits, she played with him. At first, the visits took place in a small room without space to move around. Later, visits moved to a different location that had a playground. Mother played on the playground with Enzo. Mother currently attends family therapy with Enzo.

Mother testified that immediately prior to being removed, Enzo only said a few words, like "food", "chiche" because he was nursing, and "Paw Patrol" or "PJ Mask." He never spoke of monsters.

Mother said that she hoped Enzo would be returned to her. She could financially and emotionally support him. She has worked the same job at Fiesta for more than two years. Enzo is welcome in the home where Mother lives.

On cross-examination, Mother stated that she noticed a cut behind Enzo's ear when she gave him medicine for a fever. She agreed that the bruising on Enzo's face was severe. She also said that the bruising on his bottom did not happen in a car accident. She believed her boyfriend was responsible for the injuries. She testified that Enzo has a scar on his leg from a wound he got with a

babysitter when they lived in New York. She saw the injury happen at that time. She did not know how he hurt his foot. She testified that before December 5, 2022, her boyfriend had not abused her or Enzo.

**D.      The Department's investigative worker**

The Department's investigative worker, K. Coleman, responded to the initial call from the daycare. She arrived at the daycare about 7:00 p.m. the day of the report. She observed Enzo's injuries and photographed them. She interviewed Mother. Mother was already handcuffed in the back of a police car. She was crying and upset. Coleman testified that Mother did not seem worried or shocked by Enzo's injuries. Mother gave Coleman differing explanations for Enzo's injuries. First, Mother said that she spanked Enzo on his bottom with her hand. She said Enzo had scratches, a bruise on his cheek, and injuries to his lip, ear, and toe from being improperly buckled into a car seat. She said that he fell when the driver quickly braked. Coleman then went inside to talk to the daycare workers. When the daycare workers mentioned that a man had dropped off Enzo that morning, the investigative worker went back to Mother. She asked Mother if the man who dropped Enzo off could have caused his injuries. Mother responded that it was possible. Coleman pointed out to Mother a handprint shaped injury on Enzo's bottom. Mother responded that her boyfriend may have spanked Enzo. Coleman

14

asked for the boyfriend's name and number twice, but Mother would not provide it.

When Coleman asked about possible caregivers for Enzo, Mother told her that her own mother and siblings live in New Jersey and could not travel to Houston. Enzo's father was not involved in his life. Mother gave Coleman the name of an acquaintance from church, but when Coleman called that person, the church member did not know the mother or the baby. The church member came to the daycare but was leaving town for two weeks the next day. Given that at first the church member did not know Mother or Enzo and the travel schedule, Enzo was not placed in her care.

### E.    The Department's caseworker

The Department's caseworker testified that Mother's explanation for Enzo's injuries changed over time. At first, Mother said that Enzo was thrown from his car seat while she was driving. She told the caseworker that he had a bruise and a bloody nose from this incident. Mother did not explain Enzo's other injuries.

Mother gave the caseworker her boyfriend's phone number, but nobody answered when the caseworker called the number. The caseworker explained to Mother that she needed to speak with the boyfriend and run a background check. She told Mother that the information would be needed to return Enzo to Mother. The caseworker never received contact information for the boyfriend. Once the

15

boyfriend moved out of the house that Mother shared with him, Mother told the caseworker that her boyfriend may have injured Enzo. According to the caseworker, until the boyfriend left the house, Mother was still protecting him. The caseworker described that her concerns for Enzo included that he had bruises in multiple stages of healing, which indicated that he had been abused on multiple occasions.

The Department ordered Mother to attend counseling, and Mother attended as ordered. The caseworker explained that the purpose of individual therapy was for Mother to learn how to be protective of her child. According to the caseworker, despite the counseling, Mother has not demonstrated that she can be protective of Enzo. First, Mother continued living with the boyfriend for several months, despite stating that the boyfriend had physically harmed Enzo. Second, when asked to provide placement options for Enzo, Mother suggested several people that Enzo had never met. According to the caseworker, Mother first gave the name of a woman Mother had only met two weeks prior. The Department decided against this placement because she did not know the reasons that Enzo had come into care and Enzo had never met her. Mother provided the name of another individual that she had met at a church meeting. The Department did not move forward with this individual because she had only met Mother one time. Mother gave the name of a stepbrother who lived in another state. That person could not become a licensed

foster parent in his state because he is undocumented. Finally, Mother provided the name of her landlord, who she moved in with after leaving the house she shared with the boyfriend. Mother had known the landlord less than a month, and Enzo had never met the landlord. Finally, a year into the case, Mother offered Enzo's godmother who lived in New York. That person became "uncooperative with the agency." The caseworker was concerned that Mother did not provide the name of the godmother for over a year, yet Mother gave several names of individuals who were strangers to Enzo.

While Mother maintained stable employment and had housing throughout the pendency of the case, the caseworker considered both Mother's employment and housing unstable, given Mother's pending criminal case for injury to a child. The caseworker also considered the environment unstable and unsafe for Enzo because the Department still did not know who caused physical harm to Enzo. The caseworker stated that Enzo is a vulnerable child and unable to defend himself. The concerns that caused removal had not been resolved. Mother only had supervised contact with Enzo during the pendency of the case. The caseworker did not feel that unsupervised contact with Mother would be safe for Enzo.

Enzo was in a foster placement and thriving. The foster family provides a stable environment for him, and he had bonded to them over the last year. Enzo was withdrawn and having nightmares when he first went to live with the foster

17

family. He would wake up in the night and seek the foster parents for comfort, explaining he saw "mommy monster." The Department sought individual counseling for Enzo. He has been discharged and is doing much better. The foster family hoped to adopt Enzo. The caseworker did not feel that returning Enzo to his mother was in his best interest. He is a young, vulnerable child who cannot protect himself and the Department still does not know who physically injured Enzo. The foster home both protects him and meets his needs.

On cross-examination, the caseworker agreed that the incident at the daycare occurred only a few weeks after Mother moved to Houston. At that time, she spent her time working and taking care of Enzo. The caseworker agreed that the timing meant that Mother did not have many people to recommend as alternate caregivers for Enzo. The caseworker also agreed that the foster parents, with whom Enzo was placed after the daycare incident, were strangers to Enzo when he was placed with them. The caseworker agreed that Mother had completed all services ordered by the Department, including various types of counseling and parenting classes. She had attended all supervised visits with Enzo. The first visits occurred after five or six months of not seeing each other, and after a few visits, Enzo warmed up to Mother. The first visits also took place in a facility with a very small visitation room that prevented moving around. His more recent weekly visits occurred at a location with a playground and play space. Mother sometimes brought snacks or

toys. The caseworker also agreed that Mother had a valid lease at her current residence, and that she has been described as a stable, good tenant. The landlord has indicated that Enzo would be welcome to live there and that they could stay as long as they need. The caseworker stated that housing is still unstable because Mother has a pending criminal charge, though Mother has not been found guilty.

## F.    Foster father

The foster father testified that the foster family consists of him and his spouse and their two pet dogs. Both spouses are employed. Enzo was timid at first, speaking some Spanish and little English. He attends a daycare that instructs him in both languages, and he has become more talkative. When he first arrived, he was scared. He often hid behind furniture. His bruises healed over time, but Enzo still has scars from some of the injuries he suffered before arriving to the foster parents' home.

When he first arrived, Enzo's sleep was disrupted and fitful. He would scream in fear in his sleep. When this happened, the foster parents would go in Enzo's room and comfort him. He acted insecure and terrified. The foster father testified that this would occur six or eight times a night. Over time, Enzo began talking about his nightmares and describing that they were about a monster hitting him. Enzo said, "Mommy was the monster." The first time Enzo went to a doctor's visit, he hid under a chair. The foster father also found him with tape over his

mouth. Enzo explained that he did so because his mother told him that doing so makes him a man.

The foster father testified that Enzo, who was two years old when placed with the foster family, was not toilet trained when he arrived, but he had become so during his stay with the family. After visits with his mother, Enzo sometimes had accidents and appeared to regress in his toilet learning. On another occasion, Enzo appeared to forget how to swim, despite learning swimming skills in a class. He also used more baby talk than usual. Enzo hid the toileting accidents at first, afraid that the foster parents would be mad at him. Enzo has had more tantrums after a visit, such as hitting another child at daycare the next day. The foster parents discussed each of these incidents and concerns with Enzo's therapist.

The foster father testified that Mother typically brings candy to Enzo at the visits, and he encourages Enzo to go talk to Mother during the visit. After one visit, Enzo showed a notebook that Mother had hidden in Enzo's backpack. In the notebook, Mother wrote her phone number on several pages. Enzo said that his mother told him to call her. The foster parent testified that he found the incident odd, and Enzo does not know how to use a telephone. At another visit, Enzo threw rocks at his Mother.

## G.    Guardian ad Litem

Enzo's guardian ad litem testified that her recommendation was that Mother's parental rights to Enzo be terminated and Enzo continue to live with the foster family. She was concerned that Mother engaged in endangering conduct when she lied to the police to protect an abuser. The guardian ad litem testified that Enzo was happy in the foster home and had made tremendous progress. Enzo excitedly told the guardian ad litem about activities like swimming, soccer, and baking. According to the guardian ad litem, Enzo seemed bonded to the foster parents, and it would be detrimental to him to remove him from their care.

At the conclusion of testimony, the trial court terminated Mother's rights to Enzo. Mother appeals.

## Sufficiency of the Evidence of Endangerment by Environment or Conduct

On appeal, Mother argues that the evidence is legally and factually insufficient to support a finding that she allowed Enzo to stay in endangering conditions and that she engaged in endangering conduct under Texas Family Code subsections 161.001(b)(1)(D) (endangering environment) and (E) (endangering conduct).[5]

---

[5]    Mother does not challenge the trial court's best interest finding. *See* TEX. FAM. CODE § 161.001(b)(2).

## A.    Standard of Review and Applicable Law

A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Therefore, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). However, "the rights of natural parents are not absolute" and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (internal citation and quotation removed). Recognizing that a parent may forfeit his or her parental rights by their acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *Id.*

In a case to terminate parental rights by DFPS under section 161.001 of the Family Code, DFPS must establish by clear and convincing evidence that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and that (2) termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.F.C.*,

96 S.W.3d 256, 264 (Tex. 2002). Only one predicate finding is necessary to support a judgment of termination when the court also makes a finding that termination is in the child's best interest. *See A.V.*, 113 S.W.3d at 362.

In reviewing the legal sufficiency of the evidence to support termination of a parent's rights, the appellate court views the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *J.F.C.*, 96 S.W.3d at 266. We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, disregarding all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* If, after conducting a legal sufficiency review of the record, we determine that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude that the evidence is legally insufficient. *Id.*

In reviewing the factual sufficiency to support termination of a parent's rights, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a factfinder reasonably could have formed a firm belief or conviction about the truth of the matter on which the Department bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We consider whether the disputed evidence is such that a reasonable

23

factfinder could not have resolved the disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (quoting *J.F.C.*, 96 S.W.3d at 266).

Subsection 161.001(b)(1)(D) provides that a "court may order termination of the parent-child relationship if the court finds by clear and convincing evidence. . . that the parent has . . . knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" TEX. FAM. CODE § 161.001(b)(1)(D). Subsection 161.001(b)(1)(E) requires the trial court to find by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id.* § 161.001(b)(1)(E). "To endanger means to expose a child to loss or injury or to jeopardize a child's emotional or physical health." *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (internal quotation omitted).

A child is endangered under subsection (D) when the environment creates a potential for danger that the parent is aware of but disregards. *Id.* at 721; *In re*

24

*M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g). Under subsection (D), we examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *Ruiz v. Tex. Dep't of Family & Protective Servs.*, 212 S.W.3d 804, 815 (Tex. App.—Houston [1st Dist.] 2006, no pet). In the context of subsection (D), the term "environment" includes the acceptability of living conditions as well as the conduct of others in the home. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is part of the "conditions or surroundings" of the child's home under this subsection. *M.R.J.M.*, 280 S.W.3d at 502. The parent need not have certain knowledge that an actual injury is occurring, under subsection D, the parent must at least be aware of the potential for danger to the child in such an environment and must have disregarded that risk. *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

Under subsection (E), the relevant inquiry is whether evidence exists that a parental course of conduct endangered the child's physical or emotional well-being. *In re A.J.H.*, No. 01-18-00245-CV, 2019 WL 190050, at *8 (Tex. App.—Houston [1st Dist.] Jan. 15, 2019, no pet.) (mem. op.) (citing *In re R.D.*, 995

25

S.W.2d 364, 368 (Tex. App.—San Antonio 1997, pet. denied)). Subsection (E) focuses on the parent's conduct, including acts, omissions, or failures to act, and whether the evidence shows that the child's physical or emotional well-being was endangered as a direct result of the parent's conduct. *In re K.H.G.*, No. 01-23-00675-CV, 2024 WL 1098202, at *9 (Tex. App.—Houston [1st Dist.] Mar. 14, 2024, no pet.) (mem. op). Endangering conduct need not "be directed at the child" and the child need not "actually suffer[ ] injury." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Rather, 'endanger' means to expose to loss or injury; to jeopardize." *Id.* (quoting *Boyd*, 727 S.W.2d at 533). The factfinder may infer specific danger to the child's well-being from the parent's misconduct alone. *Boyd*, 727 S.W.2d at 533. Exposing a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re K.H.G.*, 2024 WL. 1098202, at *9 (citing *In re C.V.L.*, 591 S.W.3d 734, 750 (Tex. App.—Dallas 2019, pet. denied)).

Subsection (E) requires more than a single act or omission to support termination of a parent's rights. *D.H. v. Tex. Dep't of Fam. & Protective Servs.*, 652 S.W.3d 54, 59 (Tex. App.—Austin 2021, no pet.). The evidence must demonstrate the parent's "voluntary, deliberate, and conscious course of conduct." *Id.* (quoting *In re M.L.L.*, 573 S.W.3d 353, 363–64 (Tex. App.—El Paso 2019, no pet.)); *In re M.A.J.*, 612 S.W.3d 398, 407 (Tex. App.—Houston [1st Dist.] 2020,

pet. denied) (op. on reh'g). In determining whether the parent engaged in endangering conduct under subsection (E), the trier of fact may consider conduct that occurred before and after the child was born, conduct in the child's presence and outside the child's presence, and conduct before and after the child was removed from his parent's custody. *K.H.G.*, 2024 WL 1098202 at *9.

**B.     Analysis**

Under our standard of review, we look at all the evidence in the light most favorable to the trial court's endangerment finding. *See In re J.O.A.*, 283 S.W.3d, 336, 344 (Tex. 2009). Further, we are mindful that under our standard of review, the trial court, as factfinder is the sole judge of the weight and credibility of the evidence. *See id.* at 346. Thus, the trial court was free to have not believed Mother's testimony that Enzo was injured in a fall from a car seat. The court could also reasonably conclude that her testimony as to whether she or her boyfriend caused other injuries was not credible because her explanation changed so frequently.

At the time of removal, Enzo was only two years old. He had bruises on his bottom that the caseworker testified appeared to be in the shape of a handprint. He had a blistered ear, busted toe, injured lip, and marks and bruises on his cheek. Mother does not dispute that Enzo's injuries were serious, nor does she dispute that only she and her boyfriend had opportunity to cause injury to Enzo because they

27

were his sole caregivers. *See J.F.-G.*, 627 S.W.3d at 312 (stating that "endanger" means "to expose to loss or injury; to jeopardize") (citation omitted). Mother never provided a consistent explanation for the injuries.

In contrast, the Department's workers and the daycare director testified that Enzo had numerous injuries all over his body in various stages of healing. The trial court could have relied on the caseworker's testimony that the Department's concerns that caused Enzo's removal had not been rectified. The Department did not know whether Mother or her boyfriend caused Enzo's injuries. Mother was the primary caregiver during the time Enzo was injured, and the boyfriend was the only other person who lived with them. Mother had a pending charge against her for the underlying conduct in this case, making the future stability of Enzo's homelife uncertain under Mother's care. The court also heard testimony that Enzo had nightmares about a monster hitting him when he first arrived at his foster home. Whether the injuries were caused by Mother or by the boyfriend, the trial court reasonably could have formed a firm belief or conviction that Enzo's home environment was dangerous to him as he was at risk of being abused. The court could have formed a firm belief or conviction that Mother was at least aware of the potential for danger to Enzo and had disregarded the risk. TEX. FAM. CODE § 161.001(b)(1)(D). The court could also note that Enzo did not receive new injuries after he was removed from his Mother's care and moved away from the

boyfriend. Even if the court credited Mother's testimony that her boyfriend abused Enzo, the court could conclude that Mother voluntarily and deliberately endangered Enzo by exposing him to her boyfriend and continuing to live with her boyfriend after Enzo's removal. The trial court could reasonably conclude that Enzo's physical well-being was endangered by Mother's conduct, whether her actions or her failure to act. *Id.* § 161.001(b)(1)(E). From all this evidence, viewed in the light most favorable to the court's findings, the trial court could have reasonably inferred that Mother endangered Enzo for purposes of subsections (D) and (E). *See* TEX. FAM. CODE §§ 161.001(b)(1)(D), (E). We therefore hold the evidence is legally sufficient to support the trial court's endangerment findings under both subsections (D) and (E).

Regarding factual sufficiency, Mother relies on her testimony that she did not cause Enzo's' injuries and that she eventually moved out of the home she shared with her boyfriend. The evidence showed that Mother at first told law enforcement she had spanked Enzo. Later in the case, she told the caseworker that she thought her boyfriend had done so. She offered no explanation for several of his injuries. She testified at trial that some of the injuries came from a car seat fall, but her testimony was equivocal as to the details of that incident and when it occurred. She also testified that an injury behind her child's ear was caused by a fever. We further conclude the disputed evidence contrary to the court's finding,

primarily Mother's testimony, is not so significant considering the entire record that it prevented the court from forming a firm belief or conviction that termination of Mother's parental rights to Enzo was appropriate under predicate grounds (D) and (E). *See J.O.A.*, 283 S.W.3d at 345. We hold the evidence is factually sufficient to support the trial court's endangerment findings under subsections (D) and (E). We overrule Mother's issue on appeal.

## Conclusion

We affirm the trial court's order terminating Mother's parental rights to Enzo.

Peter Kelly
Justice

Panel consists of Justices Kelly, Landau, and Rivas-Molloy.